UNITED STATES of America

v.

Stephaney ROBERTS.

UNITED STATES of America

v.

Jane DOE.

UNITED STATES of America

v.

Kenneth B. WONSON.

UNITED STATES of America

v.

Vernon L. HOLLAND and
Albert E. Mills.

Crim. Nos. 89–0033(HHG), 89–
0074(HHG), 89–0319(HHG)
and 89–0342(HHG).

United States District Court,
District of Columbia.

Nov. 16, 1989.

**1360**

Patrice I. Kopistansky, Asst. U.S. Atty., Washington, D.C., for U.S. in Crim. No. 89–0033(HHG).

Jensen Barber, Washington, D.C., for Stephaney Roberts.

Jeffrey R. Ragsdale, Asst. U.S. Atty., Washington, D.C., for U.S. in Crim. No. 89–0074(HHG).

Billy L. Ponds, Washington, D.C., for Jane Doe.

Teresa McHenry, Asst. U.S. Atty., Washington, D.C., for U.S. in Crim. No. 89–0319(HHG).

David Carey Woll, Kensington, Md., for Kenneth B. Wonson.

Patrice I. Kopistansky, Asst. U.S. Atty., Washington, D.C., for U.S. in Crim. No. 89–0342(HHG).

Thomas Abbenante, Washington, D.C., for Vernon Holland.

Alan P. Bayles, Washington, D.C., for Albert E. Mills.

## OPINION

HAROLD H. GREENE, District Judge.

The issue before the Court is the constitutionality of the newly-enacted sentencing statute, the guidelines issued by the Sentencing Commission pursuant thereto, and certain prosecutorial practices related to these measures.

On August 29, 1988, this Court suggested in *United States v. Bethancurt,* 692 F.Supp. 1427 (D.D.C.1988), that the statute and the guidelines might be flawed because of due process deficiencies and a lack of fundamental fairness. Thereafter, the Supreme Court upheld the constitutionality of the sentencing law against challenges based on separation of powers and delegation of authority grounds. *Mistretta v. United States,* — U.S. ——, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). However, the Supreme Court was not called upon in that case to consider due process issues.

More recently, fact patterns indicating due process problems in sentencing have continued to emerge in criminal cases before this Court and elsewhere. This fall, the Court of Appeals for this Circuit, in the remand of a criminal case, "direct[ed] the district court to address" the due process challenge that had been asserted there. *United States v. Baskin,* 886 F.2d 383 (1989). It thus appears that, notwithstanding *Mistretta,* it is open to the lower courts to consider due process issues arising in the context of the sentencing law and the sentencing guidelines.

The five cases before the Court raise such issues. As will be seen below, all of them highlight substantial due process problems inherent in the statute and the guidelines—problems that are exacerbated by policies and practices adopted by the United States Attorney in this District in their implementation. For the reasons stated *infra,* the Court is of the view that the statute and the guidelines are unconstitutional as so applied.

## I

### *Facts*

A. *Stephaney Roberts* [1]

On February 7, 1989, the defendant was indicted for distribution of cocaine base

---

1. Like Jane Doe (*see infra*) this defendant has requested that the details of her cooperation

(crack) and use of a firearm. A Magistrate ordered her held without bond.[2] The parties thereafter engaged in extended plea negotiations.[3] Counsel for defendant related at a motions hearing held on September 7, 1989, that his client had several times waived her speedy trial rights in order that, in the interim, she might have the opportunity to provide assistance to the law enforcement authorities. In the course of that cooperation with law enforcement, defendant met with and gave information to two agents of the Federal Bureau of Investigation, an agent of the Drug Enforcement Administration, and several Assistant U.S. Attorneys. According to counsel, notwithstanding her significant assistance and the fact that an understanding had been reached that substantial leniency would be accorded to her on account of that assistance, the prosecution ultimately agreed only to permit defendant to plead guilty to the drug distribution charge which carries a mandatory minimum sentence of ten years, the theory being that her cooperation was insubstantial. Defendant filed a motion requesting judicial assistance.

Upon inquiry by the Court, the prosecutor assigned to the case corroborated the defense contention that defendant had provided substantial assistance to law enforcement authorities, such that a motion pursuant to 18 U.S.C. § 3553(e) for a departure from the mandatory minimum sentence provisions of the Code as well as a motion for a departure pursuant to section 5K1.1 of the Sentencing Commission guidelines were warranted, stating that "if it were up to me … I would file a departure request."[4] However, the United States Attorney for this District has established a so-called Departure Committee which passes on all such requests, and this committee has declined to authorize a departure. Accordingly, no prosecution motion under either section 3553(e) or section 5K1.1 has been filed.

### B. *Jane Doe*[5]

On February 25, 1989, defendant was arrested at the District of Columbia railroad station; a search of bags located in the coach in her vicinity revealed 22 kilograms of marijuana which was ascribed by the police to this defendant and her companion (who is a fugitive). On March 23, 1989, defendant was indicted for possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841(b)(1)(D) and 18 U.S.C. § 2. Defendant pleaded guilty to these charges, with the understanding that the U.S. Attorney's Office would move for a departure from the sentence prescribed by the guidelines upon her cooperation.[6]

Defendant and her counsel claim that she has, in fact, provided substantial cooperation to law enforcement authorities, but the U.S. Attorney's Office Departure Committee, for reasons which have remained secret to all, including the Court, has decided that her cooperation was insufficient for a departure from the guidelines sentence or a reduction pursuant to 18 U.S.C. § 3553(e). The government accordingly demands that the Court sentence the defendant in accord-

---

with law enforcement be kept confidential; however, unlike in the case of Jane Doe, the entire file has not been ordered sealed.

2. Defendant had previously been ordered detained on a high surety bond by the D.C. Superior Court. On September 7, 1989, this Court ordered her released upon the posting of a property bond, and this was later modified to allow release under a home detention program.

3. Defendant also filed a motion to suppress, and when the government failed to file opposing papers, she moved on August 30, 1989 to treat the suppression motions as conceded.

4. Tr. of September 7, 1989 hearing at 5–6.

5. The defendant fears for her safety on account of her cooperation with law enforcement personnel, and the Court therefore agreed to seal her file.

6. Unless such a motion is filed, the defendant must be sentenced to imprisonment of from 21 to 27 months, pursuant to section 2D1.1(a)(3) of the guidelines, notwithstanding that she has no prior criminal record of any kind; that she is seven months pregnant and responsible for the care of her four-year old child; that as a child she had been sexually abused; that past employers consider her hard-working and very reliable; and that she apparently had no connection with the drug trade other than to transport the marijuana at issue here.

ance with the guidelines without any departure.

### C. *Mills, Holland, and Wonson*

Albert Mills and Vernon Holland were presented in the Superior Court of the District of Columbia on February 18, 1989, on a complaint of possession with intent to distribute cocaine, in violation of D.C.Code § 33–541; a Superior Court indictment was returned on April 19, 1989, for the same offense; and trial was set for October 5, 1989. The prosecution extended to defendants a plea offer for the offense of attempted possession with intent to distribute cocaine, which carries a one-year penalty. Defendants did not accept the offer, or at least not in what the government considered sufficient time,[7] and on the very day of the trial, the matter was continued at the government's request to October 17, 1989. However, even before the request for a continuance was made, that is, on September 21, 1989, the U.S. Attorney's Office secured indictments in this Court against these defendants,[8] charging them with violations of 21 U.S.C. § 841(b)(1)(B)(iii)—an offense carrying a penalty of imprisonment for five to forty years. Pending before the Court at this time are defense motions by Mills to dismiss for violations of the Speedy Trial Act and of the constitutional prohibition against double jeopardy, and a government response. In addition, Mills has moved for a dismissal on account of prosecutorial misconduct.

Kenneth Wonson was arrested on September 5, 1988; a complaint was filed in D.C. Superior Court the same day; and an indictment was thereafter returned in that court charging the defendant with possession with intent to distribute cocaine in violation of D.C.Code § 33–541(a)(1) and assault on a police officer in violation of D.C.Code § 22–505(a). The case was pending in Superior Court from that time on until October 11, 1989. *A full year after his Superior Court appearance*, on September 12, 1989, the defendant was indicted in this Court for offenses that were substantively identical with those with which he had previously been charged in Superior Court.[9] His federal court indictment, like those of Mills and Holland, resulted from his failure to accept a government plea offer.[10] The defendant has moved for a dismissal of the indictment on various grounds.

While the Court is considering the specific issues raised by the motions filed in these five cases, it will also discuss the broader due process issues presented thereby and by the interplay between the sentencing statute, the sentencing guidelines, and the prosecutorial practices.

## II

### *Prosecutorial Management of the Guidelines*

In 1984, upon concluding that the sentencing decisions of the various federal judges, particularly judges in different districts, differed widely, Congress adopted the current sentencing law [11] which has as its dominant purpose the elimination of judicially-created disparities.[12] Such disparities clearly were a problem needing atten-

---

**7.** That issue is pending before the D.C. Court of Appeals on defendants' appeal.

**8.** For a period of twenty-six days, indictments were outstanding against the defendants in both courts—a prosecutorial practice in this District that, as the Court understands it, is not uncommon.

**9.** The charges here are possession with intent to distribute 50 grams or more of crack, in violation of 21 U.S.Code § 841(b)(1)(A)(iii), and assaulting a police officer, in violation of D.C. Code § 22–505(a).

**10.** In his case, too, charges were simultaneously pending in Superior Court and in this Court for approximately one month.

**11.** Sentencing Act of 1984, Pub.L. No. 98–473, 98 Stat.1987 (codified as amended at 18 U.S.C. §§ 3551–3559, 3561–3566, 3571–3574, 3581–3586 (Supp. IV 1986), and 28 U.S.C. §§ 991–998 (Supp. IV 1986)).

**12.** *United States ex rel. Forman v. McCall,* 776 F.2d 1156, 1169 n. 11 (3rd Cir.1985) (Higginbotham, J., concurring).

tion and remedying.[13] But while the remedy adopted by the Congress has reduced the opportunity for sentencing disparities caused by judges, it has not solved the overall disparity problem but has merely shifted resposibility therefor to other officials.

The sentencing statute has largely replaced the traditional role of judges in the critical sentencing phase of the criminal process by vesting most sentencing decisions in prosecutors, and that law and the guidelines issued pursuant thereto have thus effected what may be the most fundamental change in the criminal justice system to have occurred within the past generation.[14] Indeed, the de facto transfer of much of the responsibility for sentencing from impartial judges to prosecutors has had the effect of disturbing the due process balance essential to the fairness of criminal litigation.

As explained below, these developments have been brought about by a combination of two factors: first, the prosecution almost invariably has a choice among a considerable number of statutes and guideline provisions for proceeding against a defendant accused of criminal activity; and second, the mandatory sentencing laws and the guidelines have brought about such relative inflexibility with respect to sen-

tencing that, once the charges are fixed, the judicial contribution is in a substantial proportion of the cases largely ministerial.

## A. *Availability of Statutory Options*

As a consequence of the proliferation of criminal laws that has occurred in recent years, almost any criminal act can today be prosecuted, at the option of the prosecutor, on the basis of a great many different charges, from an entire menu of substantive offenses, to various conspiracy counts, aiding and abetting, and any number of enhancements.

In the area of drug offenses, if an individual is arrested in possession of what may be termed a medium amount of cocaine base (crack), say, about two ounces (56 grams), the prosecutor has a choice in the typical situation among the following statutory options, which he may or may not exercise at his discretion: simple possession of crack;[15] possession with intent to distribute[16] crack;[17] possession with intent to distribute 5 grams or more of crack;[18] possession with intent to distribute 50 grams or more of crack;[19] conspiracy;[20] drug conspiracy involving the distribution of 5 grams or more of crack;[21] drug conspiracy involving the distribution of 50

---

**13.** For example, judges in some judicial districts at times imposed long sentences of imprisonment for the possession of relatively small amounts of marijuana while other judges, elsewhere, chose short jail terms or fines.

**14.** Most criminal cases are disposed of by a plea of guilty; in some others, a trial appears to be demanded by the defense only because, as a result of the existence of the mandatory minimum sentences and the guidelines, the defendant has no incentive to engage in plea bargaining, irrespective of the probable outcome of a trial. In all these cases, sentencing is the only proceeding with real meaning.

**15.** 21 U.S.C. § 844: statutory punishment, one year maximum.

**16.** Possession with intent to distribute charges can be proved merely by evidence of possession, coupled with the testimony of an expert witness from the police narcotics squad to the effect that the amount involved, whatever it may be, is more consistent with distribution than with personal consumption. If the expert is not brought

in by the government, the accused can normally be convicted only of the misdemeanor of simple possession.

**17.** 21 U.S.C. § 841(a): twenty year maximum.

**18.** 21 U.S.C. § 841(b)(1)(B)(iii): five year mandatory minimum. Statutory maximums set by section 841(b) are doubled if the defendant is charged, at the option of the prosecutor, with distribution to persons under the age of twenty-one (21 U.S.C. § 845) or distribution within 1,000 feet of a school (21 U.S.C. § 845a)—both of which can almost always be supported factually in a metropolitan area.

**19.** 21 U.S.C. § 841(b)(1)(A)(iii): ten year mandatory minimum to life.

**20.** 18 U.S.C. § 371: five year maximum.

**21.** 21 U.S.C. § 846 and 21 U.S.C. § 841(b)(1)(B)(iii): five year mandatory minimum.

grams or more of crack;[22] engaging in a pattern of racketeering;[23] conspiracy to engage in a pattern of racketeering;[24] engaging in a continuing criminal enterprise;[25] use of a firearm in aid of drug trafficking;[26] use of juveniles;[27] drug trafficking by one previously convicted of a similar drug offense;[28] assault with a dangerous weapon[29]—to cite only the more obvious of the available alternatives.[30]

Moreover, when choosing one or more of these statutory offenses as a basis for indictment, the prosecution is not faced, as in the past, with a broad area available for judicial discretion; the Sentencing Commission has given to each offense a specific point value equivalent to a certain number of months of confinement.[31] The sentence the court must impose, absent a departure (*see* note 39, *infra*), must conform to that direction.

While each of these offenses has different elements and thus superficially stands on its own, in actuality most of the offenses are interchangeable and can be charged or not charged against a particular defendant in the prosecution's discretion.

Depending upon what the prosecution chooses to claim, the mechanics of choosing a charge and hence the sentence,[32] operate as follows. The prosecution might initially charge the defendant either with possession with intent to distribute 50 or more grams of crack, an offense with a minimum penalty of ten years and a maximum of life imprisonment, or with possession with intent to distribute 5 or more grams of crack, which has a minimum penalty of five years and a maximum of forty years.[33] At the time of trial or after the plea, the prosecutor then has the further choice of claiming factually that the defendant[34] possessed 5 grams of crack or more than 50 grams, the former resulting in a sentence of 70 to 87 months (26 offense levels), the latter in a sentence of 135 to 168 months (32 offense levels). The prosecution could increase the base level to 38, and the sentence to 262 to 327 months, by introducing evidence that serious bodily injury resulted from the use of the substance. This latter sentence could be further increased to life imprisonment (43 levels) depending upon whether the prosecution claimed or did not claim

**22.** 21 U.S.C. § 846 and 21 U.S.C. § 841(b)(1)(A)(iii): ten year mandatory minimum to life.

**23.** 18 U.S.C. §§ 1962(a), 1963: twenty year maximum.

**24.** 18 U.S.C. §§ 1962(d), 1963: twenty year maximum.

**25.** 21 U.S.C. § 848: ten year mandatory minimum to life.

**26.** 18 U.S.C. § 924(c): five year mandatory minimum; *ten years if the weapon is a machine gun.*

**27.** 21 U.S.C. § 845b: one year minimum.

**28.** 21 U.S.C. § 841(b)(1)(A) and (B), (iii): ten year mandatory minimum to life if 5 grams or more; *twenty years to life if 50 grams or more.*

**29.** D.C.Code § 22–502: ten year maximum.

**30.** Various punishments are doubled or tripled depending upon the occurrence of particular events.

**31.** The guidelines also specify particular terms for supervised release and for fines.

**32.** The Department of Justice's *Handbook on Sentencing Guidelines* recognizes this fact, directing that prosecutors should "consult the guidelines at the charging stage in an effort to achieve the most appropriate sentence for the conduct committed...." The *Handbook* also contains suggestions to U.S. Attorneys for additional management of the guidelines to achieve particular sentencing results; *e.g.,* where under the guidelines only a certain number of offenses will "count" for guidelines purposes, the prosecutor should divide the charges into two separate indictments (p. 36).

**33.** If conspiracy is charged instead, with a maximum statutory sentence of five years, the guideline sentence will be that statutory maximum—sixty months.

**34.** A typical defendant may be assumed for purposes of the present example to have a criminal history category of II, that is, one consisting of *one prior felony conviction.* However, here again, the prosecutor is free to augment that history and hence significantly alter the guideline computations, making note of the fact, for example, that the defendant may have been on probation when the offense was committed; or he may substantially minimize that history by not insisting on the existence for guideline computation purposes of the prior offenses or some of them.

that the defendant had committed the crime after a prior conviction for a similar offense.

The prosecution is not limited to determining these base scores; additional opportunities exist for dictating the defendant's sentence, inasmuch as the choice of subsidiary facts asserted or not asserted for purposes of guideline applications is equally broad and equally critical. Let it be assumed, for example, that a particular defendant is charged with possession with intent to distribute 5 or more grams of crack, an offense which, as noted above, the Sentencing Commission has decided must be punished by imprisonment for 70 to 87 months, the prosecutor can still vary this presumed sentence up or down as follows. He may claim that the defendant had a weapon (as is typically a fact), and the sentence would thereby be increased by 17 to 21 months (to 28 offense levels);[35] he may additionally assert that the victim was unusually vulnerable, thereby adding 21 to 27 months to the sentence (to offense level 30); or he may claim that the defendant was a supervisor in the drug scheme, a claim that would raise the sentence by an additional 27 to 33 months (to offense level 32).[36] It is important to keep in mind that if the prosecution chooses not to make these claims—as it often will not, because of a plea bargain or perhaps simply as an exercise of discretion—none of these penalties will be added to the sentence even if the factual predicate therefor exists.[37]

Because of these many variables, and others, the prosecutor has de facto control not only of the charges against a defendant but also of the sentence that must and will be imposed.[38] In short, the prosecutor's selection of the charges available to him from his large arsenal amounts at the same time to an almost totally precise selection of the ultimate sentence to be imposed upon conviction or plea of guilty. It follows that, when the judge proceeds, with great and historical solemnity, to pronounce the sentence, he has by and large had no substantive role other than to ratify the choice of sentence already predetermined by the prosecutor's decisions.[39]

### B. Sentencing Disparities

Because of the many options available to him, the prosecutor is free to introduce as much sentencing disparity into the system as he may choose. Prosecutors, sometimes

**35.** As an alternative to this 17–to–21 month increase, the prosecutor could bring a statutory weapons charge, pursuant to 18 U.S.C. § 924(c), thereby achieving a mandatory five-year consecutive sentence.

**36.** These examples far from exhaust the choices open to the prosecution. Other choices are to claim that the defendant was an organizer or leader of the drug scheme; that the victim was an official who was victimized on account of his official status; that attempted obstruction of the administration of justice occurred; and numerous others.

**37.** It may be said that some of these variations are factual in nature and subject to contest. While in theory probation officers or defense counsel may attempt to rectify misstatements of such operative facts, in practice this is problematic, for the prosecution through its access to police, FBI, and DEA personnel has superior sources of information. Where there is a plea bargain, the prosecution and the defense have of course an incentive to cooperate on the submission of the operative facts. The Annual Report of the Judicial Conference of the United States to the Sentencing Commission (Sept. 13, 1989), at 12, takes note of the misstatement problem in the context of plea bargaining and guideline factor bargaining.

**38.** It may be difficult for those who do not "live with" the system and view it in operation on a daily basis, to realize how openly prosecutors can and do now make selections in almost every criminal case on which many of the stable of available charges to bring and hence on the amount of imprisonment time the defendant will necessarily be required to serve.

**39.** The judge does possess the technical authority to depart from the guidelines, but that authority is itself so rigidly regulated by the guidelines that, in practical fact, it can in most situations have only the most minimal effect. In its section on departures, the Sentencing Commission has made it clear that, except in an atypical situation, a court may not depart from a guideline-specified sentence with respect to any aggravating or mitigating circumstances the Commission has already taken into consideration. Sentencing Manual at p. 1.6; see also, 18 U.S.C. § 3553(b). Since the Commission has taken almost every conceivably relevant factor into consideration, the courts are in practice in most instances powerless to depart from the guidelines.

for good reasons, sometimes for bad—just like some judges before them—have done just that. Every district judge has witnessed, and witnessed many times, the bringing of wholly disparate charges against defendants whose conduct was essentially identical,[40] the consequence being that the judge is required by the guidelines to impose sentences that he may consider,[41] or that objectively are, arbitrary and discriminatory in every meaningful sense.[42]

Moreover, these disparities, unlike judge-created disparities, are obscured from public view. While judicial sentences and hence judicial disparities are pronounced on the public record, and are accordingly plain for all to see, disparities brought about by prosecutorial practices and conduct are

generated by decisions made off the record in the prosecutorial offices.[43]

To be sure, the prosecution has long had the charging authority, and on this basis it is argued by some that its use of that authority under the new sentencing statute is nothing new. But what is new and what is revolutionizing the criminal justice system is that, unlike in the past, when the prosecutor now selects the charge, his decision is generally [44] tantamount also to a decision [45] as to the sentence.[46]

### C. *Due Process*

■ The question arises, of course, whether, whatever may be the policy implications of this development, the de facto

---

**40.** The Sentencing Commission itself has stated that it "recognizes that a charge offense system has drawbacks of its own. One of the most important is its potential to turn over to the prosecutor the power to determine the sentence by increasing or decreasing the number (or content) of the counts in an indictment." Guidelines Manual at p. 1.6.

Commentators have similarly noted that
   With no new policy on pleas advanced by the Sentencing Commission, and with great restraint placed upon the judges prosecutors have moved quickly to consolidate the power of sentencing in their own hands. As a result, their already formidable discretion has expanded exponentially, they have emerged as the nation's sentencers, say many of the judges. * * * The effect has been to create the possibility of disparity that has the potential of being at least as bad as the system the guidelines replaced....
Chambers, *When a Plea Was a Plea,* The National Law Journal (Nov. 6, 1989), at 13–14. *See also,* Altschuler and Schulhofer, Judicial Impressions of the *Sentencing Guidelines,* 2 Federal Sentencing Reporter 94 (1989).

**41.** There is some question whether a judge may, consistently with Article III of the Constitution and his oath of office, be required to impose a sentence that he regards as discriminatory and violative of equal protection principles.

**42.** As the Court related in *Bethancurt, supra,* for example, in one of the cases there presented, one defendant in a drug transaction was to be given a sentence ten times as long as that imposed on the other with similar culpability—"the result of the combination of the prosecutor's charging choices and the 'vending machine' scheme set up by the guidelines...." 692 F.Supp. at 1433. A great many such events

occur every day in many courtrooms. *See also,* Parts III and IV, *infra.*

**43.** For that reason, even the most indefensible kinds of discrimination can determine such sentences. To put it more concretely, some of the impetus for guideline sentencing was generated by the concern that judges in some areas were dealing more harshly with black defendants than with whites. Can it really be believed that United States Attorneys and their assistants in those same areas, who now largely have control of sentencing through their control of the charges, will be less governed by their prejudices, particularly since their decisionmaking will not be out in the open?

**44.** This does not apply to every criminal offense; but it does apply to those offenses which form the bulk of criminal litigation in the federal courts.

**45.** When the sentences are not so fixed, the judge's power to sentence within a certain range was always available to check and balance the prosecution's charging authority.

**46.** This new method of proceeding in criminal cases is illustrated by the fact that today defendants are colloquially being charged with, and discussions between prosecutors and defense counsel revolve around, not so much an offense with a substantive name, but with an appellation such as a "ten-year felony," a "twenty-year felony," and the like. These descriptions are completely apt. The penalty is the one that has been prescribed by the Congress' mandatory minimum sentence laws or it may be one that is called for by the guidelines established by the Sentencing Commission. It is a singularly unimaginative prosecutor who, with the use of these two instruments, is unable to dictate with

transfer of the sentencing authority from the judge to the prosecutor results in a violation of due process. More directly, the issue is whether our constitutional system of due process tolerates a situation where the key sentencing responsibility is exercised not by a judge but by the prosecuting attorney. In the Court's view the answer must be in the negative.

Sentencing has historically been the responsibility of judges, the field in which the judge was to bring to bear his accumulated experience, judgment, and, hopefully, wisdom, in order to determine what punishment was appropriate for the offense and the offender, convicted after a trial with well defined rules of evidence and procedure or after a plea of guilty. Although exceptions to this scheme were made by the enactment of mandatory minimum sentence laws,[47] judicial decisionmaking has until now remained the hallmark of the Anglo–American system of justice for the great bulk of criminal offenses.[48]

The role of judges in sentencing has been a part of the due process core of criminal litigation because, by the very nature of their positions in the system, judges are expected to be and generally are fair, without partiality to one side or the other. Prosecutors obviously are not, as human beings, different from judges;[49] however, their positions predispose them not to be even-handed while occupying those positions, but to favor the prosecution side of criminal litigation. Yet, under the new sentencing scheme, prosecutors are not only performing their customary responsibilities of filing the charges and presenting the government's side in the course of criminal trials; their power over sentencing, as discussed above, often effectively constitutes them also as the authority which determines punishment. This change has in substantial measure eliminated the safety valve in terms of fairness and due process of an impartial judge exercising whatever sentencing discretion any particular criminal statute allows.

One way to test these propositions is to examine the effect of the new sentencing scheme on allocution. The right to allocute, which criminal defendants have had ever since the early days of the common law, *Anonymous*, 3 Mod. 265, 266, 87 Eng. Rep. 175 (K.B.); *Green v. United States*, 365 U.S. 301, 304, 81 S.Ct. 653, 655, 5 L.Ed.2d 670 (1961), is still practiced in the courts, but it is rapidly losing much of its substantive meaning. Allocution frequently no longer serves any real purpose, since the judge to whom the allocution is addressed either has no discretion at all, or his discretion is so circumscribed that a plea for justice or leniency,[50] or an explanation of such factors as contributions to the public good, the nation, or the community, special family circumstances, a lesser or coerced role in the commission of the offense, or other extenuating circumstances, can accomplish little, if anything, once the prosecutor has made his decision.[51]

The real allocution now takes place in the back rooms of the U.S. Attorney's Office where typically a young prosecutor, sometimes with limited experience, decides on such subjects as whether to charge the

---

almost unfailing precision exactly what the sentence will be.

**47.** These laws are valid. *United States v. Bridgeman*, 523 F.2d 1099, 1191 (D.C.Cir.1975).

**48.** The new system has thus overthrown the checks and balances approach to criminal litigation—the prosecutor to charge and to produce evidence on behalf of the government, the judge to rule on evidence and to determine the sentence—in favor of a central role for the prosecutor in a decisive phase of that litigation.

**49.** Witness the many prosecutors who have become judges in the federal system as well as elsewhere.

**50.** The right to present mitigating evidence at sentencing should be regarded as an essential of due process. Note, *Procedural Due Process at Judicial Sentencing for Felony*, 81 Harv.L.Rev. 821, 842 (1968).

**51.** For the same reason, substantial portions of the Probation Department's presentence reports, which describe the defendant's background and history, have become largely obsolete. The principal utility of the reports that remains is that they provide the computation of the various points and levels that make up the sentence under the guidelines. *See also*, Annual Report of the Judicial Conference of the United States to the United States Sentencing Commission (Sept. 13, 1989), at 13.

defendant with a five-year or a twenty-year felony; whether to indict on a count calling for a consecutive sentence, or one without such a requirement; whether to include in the record, or not, that the defendant had a weapon at the time of the offense; and the like. As related above, each of these decisions has an impact not only on sentencing in general but, more often than not, it compels the precise sentence the Court must impose.

Some may believe that because prosecutors are the representatives of law enforcement in the court process, they will be "tougher" on criminals than the more neutral, more detached judicial officers. That may or may not be true. However, any gain in harshness of punishment from the substitution of prosecutors for judges with respect to the sentencing phase is more than offset by the loss in terms of fairness and hence legitimacy. In any event, to substitute prosecutors for judges with respect to the sentencing responsibility is no more compatible with due process than would be the prosecutorial assumption of such other functions as the conduct of hearings on bail or on motions to suppress. In the view of this Court, none of these can be accommodated in the traditional due process framework that has existed in our law since Magna Carta.

For the reasons stated, the Court concludes that the sentencing statute and the guidelines issued pursuant thereto necessarily [52] effect substantial violations of due process with respect to criminal defendants in the federal courts and are unconstitutional on this basis alone. It is not necessary, however, to rest the resolution of the cases before the Court on so broad a ruling, for the United States Attorney has skewed the process even further so as to introduce a special dimension of arbitrariness.

## III

### Transfers Between Courts

The U.S. Attorney for this District has recently begun a practice of transferring pending criminal cases from D.C. Superior Court to this Court under circumstances which violate both the due process and the speedy trial rights of the defendants.

### A. Facts

What typically happens is that, after the case of a criminal defendant has been pending in Superior Court for a period of between six months and one year,[53] an event occurs that the prosecution deems troubling—the defendant may refuse to plead guilty and he may instead insist on his right to a trial, or the case may be called for trial but the prosecution, for one reason or another, may not be ready to proceed. At that juncture, the prosecutor will simply secure a fresh indictment for the same violations in this Court, mooting the embarrassing Superior Court problem and starting the speedy trial clock running all over again. Three of the cases now before the Court involve this practice.

Defendants Mills, Holland, and Wonson were initially indicted in D.C. Superior Court for distribution of drugs; after some eight months in the case of two of them, and twelve months in the case of the third, when the day of trial arrived in that court, the prosecution mooted all existing issues, including speedy trial issues, by securing an indictment for the same crime in this federal court, to begin the running of the time periods of the Speedy Trial Act. The new indictment here had an even more far-reaching effect, however, than that on speedy trial questions alone. While in Superior Court sentences are imposed the old-fashioned way, by judges, by his transfer

---

**52.** The Sentencing Commission has attempted to find means for eliminating or reducing prosecutorial discretion and hence sentencing disparity engendered by that discretion. Ultimately, the Commission has had to abandon that effort to develop a real offense sentencing system because it generated too many other problems. *See* United States Sentencing Commission Guidelines Manual, pp. 1.5 to 1.6. In short, the

transfer of sentencing authority from the judge to the prosecutor and hence the opportunity for causing disparities are inherent in the scheme established by the sentencing statute.

**53.** During that period, the defendant may or may not be incarcerated.

of the case to this Court the prosecutor also acquired the power to set the sentence by deciding on the charge, as explained above. As will now be seen, such manipulation of the power to charge as between the local court system and the federal court system merely to seek an advantage over the accused may well be illegal by itself.[54]

### B. *Parity Between Courts*

Prior to 1966, the Criminal Justice Act which provides for compensation to criminal defense lawyers, was applied in the District of Columbia in accordance with its language only to the federal, not the local courts. In February of 1966, the undersigned, then a judge of the D.C. Court of General Sessions (hereinafter the Court), concluded that the Act applied as well to the Court of General Sessions, the predecessor of the D.C. Superior Court. The Court noted that then, as now, it was entirely up to the United States Attorney for this District whether to prosecute certain crimes in the U.S. District Court or in the D.C. Court of General Sessions, and it held that to "permit the prosecutor to determine, by his unfettered choice of the initial charge, whether or not the defendant will enjoy the benefits of the Criminal Justice Act is too vast a grant of power." To avoid unconstitutionality, the Court therefore interpreted the CJA to apply as well to the local courts. *United States v. Walker,* D.C.Gen. Sessions, Crim. No. 363–66.

Because expenditures of funds were necessitated by the decision, the matter was forwarded by the Director of the Administrative Office of the U.S. Courts[55] to the General Accounting Office for a ruling. The Comptroller General, by a decision dated June 13, 1966, ruled that he "agree[d] with Judge Greene's opinion that the Crimi-

nal Justice Act of 1964 should be construed as covering the United States Branch of the Court of General Sessions ... and the vouchers ... may be paid...." 45 Dec. Comp.Gen. 785, 792–3 (1966).[56] The rationale of that decision is applicable here.

While there is no question about the congressional authority to empower the U.S. Attorney to be the government's prosecuting arm in both the federal and the local courts in the District of Columbia, *United States v. Robertson,* 810 F.2d 254, 258 (D.C.Cir.1987), there must be, consistently with the principles of the *Walker* decision, some measure of rough parity of defendants' rights as between the two tribunals, especially if the prosecutor assumes the right to transfer cases and defendants on a wholesale basis from one to the other. At a minimum, the U.S. Attorney is precluded, like all other public officials, from using his power to transfer as means for arbitrary action.

In the past, the dual role of the United States Attorney has not given rise to serious due process problems; however, when that official manipulates the two roles on a large scale to achieve significant tactical advantages in order to defeat defendants' rights, these constitutional problems cannot be avoided. The facts of the instant cases, as described above, illustrates that problem; it is also thrown into relief, and perhaps even more starkly, by others which have recently been transferred to this Court from the Superior Court.

For example, in *United States v. Saunders,* No. 89–402 (D.D.C. filed Oct. 24, 1989), Saunders' co-defendant in Superior Court pleaded guilty to attempted possession of cocaine and was sentenced to one year's probation. Saunders himself refused to plead guilty. The prosecution

---

**54.** No other prosecutor in the United States has the power to shift prosecutions at will between the local and the federal courts.

**55.** The budget of the United States Courts was to be charged with the CJA fees for the attorneys for the thousands of indigent defendants in the District of Columbia courts. The Administrative Office informed the General Accounting Office that it disagreed with the Court's decision; the Department of Justice, on the other

hand, advised the GAO that it agreed with that decision.

**56.** CJA payments to counsel representing criminal defendants in the D.C. Court of General Sessions and thereafter the D.C. Superior Court were thereafter routinely paid pursuant to this precedent, and ultimately legislation was enacted to achieve the same purpose. D.C.Code § 11–2601 *et seq.*

thereupon secured a continuance on the very day of the Superior Court scheduled trial date,[57] and it also procured defendant's indictment in this Court for possession with intent to distribute more than five grams of crack, 21 U.S.C. § 841(b)(1)(B)(iii), an offense carrying a mandatory minimum sentence of five years. Thus, this defendant, merely for not relinquishing his right to a trial by jury, now faces at least five years in the federal penitentiary for his audacity, while his co-defendant, who did plead guilty, was sentenced to probation.

Similarly, in *United States v. Peace*, Crim. No. 89–365, the defendant and a co-defendant were indicted in Superior Court; the co-defendant pleaded guilty and was sentenced to probation; Peace did not plead; the charges against him were dismissed, and he was thereafter indicted in this Court on charges that were substantively identical but which carried a far more severe sentence (45–year maximum versus 17–year maximum on the Superior Court charges). And in *United States v.*

*Wiggins*, Crim. No. 89–301, the defendant was indicted in Superior Court, and the case was set for trial for July 18, 1989. The government's motion for a continuance on the ground that a witness was unavailable was denied. The government thereupon dismissed the charges, and the following month had the defendant indicted in this Court on a basis substantively identical to the charges that had been dismissed.

These types of actions may or may not amount to prosecutorial misconduct,[58] but they illustrate how the United States Attorney is managing statutes, guidelines, court schedules, and the processes of the several tribunals to achieve his purposes,[59] without the scrupulous attention to fairness that is normally the hallmark of the American criminal justice system.

For the reasons stated, the indictments filed in this Court against defendants Mills, Holland, and Wonson may be subject to dismissal on due process grounds.[60] However, as seen below, the Court will also consider the Speedy Trial Act, and it will

---

**57.** The Superior Court case was never dismissed, and a new trial date of November 27, 1989 has been set in that court.

**58.** In the leading case of *Bordenkircher v. Hayes*, 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978), the Supreme Court distinguished between additional, more serious charges brought in the context of plea negotiations where the defendant is "fully informed of the true terms of the offer when he [makes] his decision to plead not guilty," and a situation such as that apparently involved in the instant cases "where the prosecutor without notice brought an additional and more serious charge after plea negotiations relating only to the original indictment had ended with the defendant's insistence on pleading not guilty." 434 U.S. at 360, 98 S.Ct. at 666. In the latter situation, in the view of the Supreme Court, prosecutorial misconduct is present. Subsequently, in *United States v. Goodwin*, 457 U.S. 368, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982), the Court upheld prosecutorial action even though the defendant had not been warned of the possibility of new charges prior to his rejection of the plea. However, the Court went on to state that "we, of course, do not foreclose the possibility that a defendant in an appropriate case might prove objectively that the prosecutor's charging decision was motivated by a desire to punish him for doing something that the law plainly allowed him to do." *Id.* at 384, 102 S.Ct. at 2494.

**59.** A second prosecution in this Court also permits the prosecutor to cause defendants to be held in preventive detention, although for the entire period of their Superior Court release on personal recognizance or otherwise many of them committed no offenses and were present for all court appearances. In fact, defendants typically come to court here voluntarily in response to a simple written notice, many months after first being charged in Superior Court, only to be faced with an immediate demand for their incarceration without bond pending their trials here pursuant to the federal bail laws.

**60.** Although the Equal Protection Clause of the Fourteenth Amendment does not apply to the federal government, an equal protection component has been incorporated into the Due Process Clause of the Fifth Amendment as a measure of arbitrary treatment. *Bolling v. Sharpe*, 347 U.S. 497, 499–500, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954); *Washington v. Davis*, 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976); *U.S. Department of Agriculture v. Moreno*, 413 U.S. 528, 533, 93 S.Ct. 2821, 2825, 37 L.Ed.2d 782 (1973); *Frontiero v. Richardson*, 411 U.S. 677, 680 n. 5, 93 S.Ct. 1764, 1767 n. 5, 36 L.Ed.2d 583 (1973); *Hobson v. Hansen*, 269 F.Supp. 401 (D.D.C.1967). *See also*, Kenneth L. Karst, "The Fifth Amendment's Guarantee of Equal Protection," 55 North Carolina Law Review 541 (1977).

hold a hearing with respect to one of these defendants.

## C. *Speedy Trial Act*

■ Application of the Speedy Trial Act, 18 U.S.C. § 3161(b), which mandates that "an information or indictment shall be filed within thirty days" from the date of arrest, likewise casts substantial doubt on the legality of the government's actions herein. As related above, two of the defendants, Mills and Holland, were arrested on February 16, 1989, and their indictment in this Court was filed on September 21, 1989, over seven months after the arrest, rather than the thirty days required by section 3161(b). The third defendant, Wonson, was arrested September 5, 1988, but he was not indicted here until September 12, 1989, over one year later. The government defends these lengthy delays on the basis that the Speedy Trial Act does not prevent the return of a federal indictment more than thirty days after an individual's arrest on state charges, *United States v. Adams*, 694 F.2d 200, 202 (9th Cir.1982), and that for purposes of this rule, District of Columbia arrests are to be equated with state arrests. *United States v. Robertson, supra*, 810 F.2d at 257.

The *Robertson* decision is of course critical to an analysis of defendants' claims of denial of their speedy trial rights. In that case, the Court of Appeals stated that the U.S. Attorney for the District of Columbia "has a freer hand than do his counterparts in other districts ...," and it recognized that he therefore "could manipulate the order of arrests, so as to intentionally avoid the Act, without having to obtain the cooperation of an independent local prosecutor." 810 F.2d at 258. However, the court found the chances of such an abuse to be slim, stating that there was "no claim that the delay and shift of jurisdiction resulted from any intent to evade the Act, and nothing in the record would support such a claim." *Id.*

It is in this respect that the instant cases differ from *Robertson*. With some forty to eighty [61] prosecutions having recently been transferred from Superior Court to this Court, all or most of them many months after arrest and the filing of Superior Court charges, the Court would have to be blind to avoid the conclusion that such a massive operation was undertaken for the purpose of gaining tactical advantages over the defendants in these cases. As indicated above, these tactical advantages embrace both the federal preventive detention law and the sentencing statute. But the scheme adopted by the U.S. Attorney also constitutes a manipulation of the Speedy Trial Act, on the following basis.

If the prosecutor charged a large number of defendants *ab initio* in this Court, with its fifteen judges versus over fifty in Superior Court, it might be expected that the Speedy Trial Act requirement of a trial within seventy days of arraignment would lead to many dismissals for failures to comply with the Act. By bringing the charges initially in Superior Court, the prosecution is not subject to the time pressures of the federal law,[62] but is able instead to count on delays of many months to a year or more. As the instant case demonstrates, when the Superior Court trial date finally arrives, the prosecution may seize the opportunity to secure new indictments in this Court for those who have refused to plead guilty or are for other reasons singled out for exposure to the federal law. At that juncture the investigations of police agencies and the preparations of the individual prosecutors have presumably been completed, and the government would at that point be able to meet the Speedy Trial Act deadlines without having complied with them for a great many months. On this basis, the Court now makes the finding absent in *Robertson:* that the U.S. Attorney has manipulated the system so as to "intentionally avoid the [Speedy Trial] Act."

If the prosecution may proceed as it did in these and the other cases transferred

---

**61.** It is the general understanding in this Court that eighty cases have recently been transferred; the U.S. Attorney maintains that only forty such cases have been transferred thus far.

**62.** There is no speedy trial law applicable to the District of Columbia courts.

during the recent period, the thirty-day requirement of the Speedy Trial Act could quickly become a dead letter in the District of Columbia: the U.S. Attorney would be able to hold any and all arrested persons as Superior Court defendants for as long as he wished,[63] and when he ultimately decided to secure indictments here, the entire delay would automatically be forgiven for Speedy Trial Act purposes. That result is not consistent with what the Congress intended when it passed the Act.

In recommending that the Speedy Trial Act not be made applicable to the D.C. Superior Court despite the fact that the United States Attorney has prosecutorial authority over major District of Columbia offenses as well as over federal offenses, the House Judiciary Committee stated that "[i]t is conceivable that this type of overlapping jurisdiction could result in 'forum-shopping' in an attempt to escape the speedy trial restrictions that will apply to the federal courts in D.C.," and that such forum shopping "would be antithetical to the goals of Federal speedy trial legislation." H.R.Rep. No. 93–1508, 93d Cong., 2d Sess. 40, reprinted in, 1974 U.S.Code Cong. and Admin.News 7401, 7441.

### D. *Conclusion*

All that having been said, it is still true that the principal vice of the wholesale transfer of criminal cases from the local to the federal court[64] is that it gives the prosecution one additional lever with which to manipulate the system so as to compel the imposition of what he regards as the proper sentence.

The breadth of the power possessed by the U.S. Attorney and the arbitrariness with which it is being exercised are most vividly illustrated by a comparison of the cases that are being transferred from the D.C. Superior Court to this Court with those that remain there, and the conse-

quences in each instance. Although this Court is not in a position on this record to provide a statistical analysis, episodic evidence suggests that the prosecutions that have been transferred to this Court do not differ in any material respect from those that have remained in Superior Court. For example, within the past three weeks, this Court conducted the trial of a female defendant, without any prior criminal record, who had been charged with possession with intent to distribute 5.5 grams of crack. *United States v. Rosenboro*, Crim. No. 89–0237 (filed July 29, 1989). Under 21 U.S.C. § 841(b)(1)(B)(iii), a *mandatory minimum* sentence of imprisonment for five years is prescribed because the quantity exceeded five grams. At the same time, thousands of drug cases are being routinely prosecuted in Superior Court, including many that involve crack, large quantities of drugs, or both. Under District of Columbia law applicable in that court, D.C.Code § 33–541(b), the same offense carries a *maximum* sentence of five years of imprisonment, and no minimum of any kind, with probation available as well.

Simply by selecting out some defendants from among the many in Superior Court for prosecution in this Court, the U.S. Attorney is able to ensure that these particular defendants will be sentenced to imprisonment for a minimum of five or ten years, while others, not so selected but otherwise similarly situated, will, upon conviction, be sentenced under the discretionary sentencing provisions available in Superior Court to a small fraction of that time.

The issue is not which set of laws is preferable: that is a matter for decision by the legislative bodies. But if there exists a more flagrant opportunity for the exercise of arbitrary power, inevitably resulting, at the whim of the U.S. Attorney, in widely disparate sentences, without the possibility

---

**63.** This period may extend at least until the cases are reached for trial in Superior Court, that is, eight to fifteen months or more.

**64.** The flooding of this Court with what essentially are local cases may cause problems in terms of the ability of the Court to dispose of its

complex criminal and civil caseload within a reasonable period of time. That, however, is an issue for understandings between the various administrative officials; it raises no legal, let alone constitutional, problems, and is therefore not addressed herein.

of review by anyone, it has not come to the Court's attention.

Vigorous efforts to proceed against the large-scale drug distributors and conspirators who are undermining the peace and tranquility of this city are to be applauded. In view of the menace that the drug trade represents, strict, even harsh sentences are both useful and necessary. This Court's concern is not with such sentences; they are daily proving their utility, and there can be no question of their legality.

The Court's concern is with fairness and due process. It is not necessary for the fight against the illegal drug dealers or other criminals, nor is it fair and legal, to shortcut the Constitution by resorting to procedures which violate the requirements of the Due Process Clause. Such shortcuts would be invalid in any case; they are particularly indefensible when they are applied, as they are in cases such as those before the Court here, against mere drug couriers or "mules," without inside knowledge of or involvement in the operation of the major drug conspiracies.[65] Moreover, as discussed in Part IV, *infra*, these small-time offenders, unlike drug kingpins, cannot "buy" their way out of the mandatory sentences by furnishing cooperation to law enforcement—at least not in the way the U.S. Attorney is interpreting the cooperation provisions of the sentencing statute and the guidelines.

## IV

### The Issue of Cooperation

Two of the cases before the Court, those of Stephaney Roberts and of Jane Doe, involve the provisions of the sentencing law and the guidelines which authorize departures from otherwise mandatory sentencing requirements. 18 U.S.C. § 3553(e) provides

Upon motion of the Government, the court shall have the authority to impose a sentence below a level established by statute as minimum sentence so as to reflect a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense. Such sentence shall be imposed in accordance with the guidelines and policy statements issued by the Sentencing Commission pursuant to section 994 of Title 28, United States Code. (Emphasis supplied).

Similarly, section 5K1.1 of the guidelines issued by the Sentencing Commission provides

*Upon motion of the government* stating that the defendant has made a good faith effort to provide substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines.

(a) The appropriate reduction shall be determined by the court for reasons that may include, but are not limited to, consideration of the following conduct: [listing five factors]. (Emphasis supplied).

### A. *General*

■ Although both the statute and the guidelines in terms restrict such departures to situations where a motion therefor has been filed by the government, several courts have indicated that these provisions may be read also to permit the defendant to initiate the process, or that, unless they are so construed, they are unconstitutional.[66]

In the first category is the Court of Appeals for the Fifth Circuit which has flatly stated that section 5K1.1 "obviously does not preclude a district court from entertaining a defendant's showing that the government is refusing to recognize ...

---

**65.** That is not to say that such offenders should not be punished; the question only is whether it is appropriate to manipulate the system so as to require the imposition of the harshest penalties that such manipulation can yield.

**66.** Most courts have decided that only the prosecution may initiate the process, and they have found no constitutional problems on that basis. *See, e.g., United States v. Musser,* 856 F.2d 1484, 1487 (11th Cir.1988); *United States v. Ayarza,* 874 F.2d 647, 653 (9th Cir.1989); *United States v. Huerta,* 878 F.2d 89 (2d Cir.1989).

substantial assistance." *United States v. White*, 869 F.2d 822, 829 (5th Cir.1989).

In the second category are, *inter alia*, the Court of Appeals for the Eighth Circuit and the District Court for the Central District of Illinois. In *United States v. Justice*, 877 F.2d 664 (8th Cir.1989), the Eighth Circuit, while not striking down 18 U.S.C. § 3553(b) or section 5K1.1 of the guidelines, made it quite clear that, if it had to reach the issue,[67] it would hold that, notwithstanding the language of these provisions, "in an appropriate case the district court may be empowered to grant a departure notwithstanding the government's refusal to motion the sentencing court if the defendant can establish the fact of his substantial assistance...." 877 F.2d at 668–69. The court relied on several factors for this conclusion: (1) the provisions place discretion that has historically been in the hands of a federal judge into the hands of the prosecutor; (2) since the exercise of the prosecutor's discretion appears to be unreviewable, he is able to exercise far greater discretion than has ever been vested in district judges; (3) the issue whether a defendant has rendered substantial assistance may be a disputed factual issue, and for that reason it is one that is improperly left to the prosecutor to resolve.

More recently, the District Court for the Central District of Illinois did decide that both section 3553(e) and guideline section 5K1.1 are unconstitutional on fundamental fairness grounds, stating that it "refuse[d] to be precluded by an unconstitutional statute and Sentencing Guideline as a basis for downward departure from the statutory minimum or the guidelines range." *United States v. Curran*, 724 F.Supp. 1239 (C.D.Ill., 1989).[68]

Like these tribunals, this Court is of the view that to preclude a defendant from contesting the refusal of the prosecution to acknowledge his substantial cooperation with law enforcement authorities so as to establish his eligibility for sentencing leniency under law, is to violate his due process rights.

It is well established by the decided cases that an accused has a right to due process during the sentencing stage. *See, e.g., United States v. Satterfield*, 743 F.2d 827 (11th Cir.1984); *United States v. Pugliese*, 805 F.2d 1117, 1122–23 (2d Cir.1986); *Shelton v. United States*, 497 F.2d 156, 159 (5th Cir.1974). It is also settled that a fair sentencing proceeding includes the requirement that the sentence be based on accurate and true information;[69] that the defendant have the opportunity to question the proceedings leading to the imposition of sentence;[70] and that he be allowed to contest the facts presented or relied upon to support the criminal penalty.[71] As the *Pugliese* court noted, citing 3 *Standards for Criminal Justice, Sentencing Alternatives and Procedures*, Standard 18–6.4 at 448 (1986 Supp.), both sides "should have an effective opportunity to rebut allegations likely to affect the sentence...." 805 F.2d at 1123.

Section 3553(e) and guideline 5K1.1 violate these tenets. When a defendant has rendered substantial assistance to law enforcement but the government refuses to file the requisite motion, the sentence the Court is required under law to impose will not be based on true and accurate information: those factors that, because of the cooperation, would call for a reduction in the otherwise mandatory sentence will not be before the Court, and the Court will have to sentence as if the defendant had

---

67. In that case, the District Court, in the exercise of its discretion, and on account of benefits the defendant had received during the charging phase of his case, had made a finding that the record did not justify a departure. The Court of Appeals did not believe that it was justified in overturning this exercise of discretion.

68. *See also, United States v. Galan*, No. 89 Cr. 198, 1989 WL 63110 (S.D.N.Y. June 8, 1989) (LEXIS 6383).

69. *Satterfield*, 743 F.2d at 840. The defendant has a right not to be sentenced on the basis of inaccurate information. *United States v. Hodges*, 556 F.2d 366, 369 (5th Cir.1977).

70. *Gardner v. Florida*, 430 U.S. 349, 358, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393 (1977).

71. *Townsend v. Burke*, 334 U.S. 736, 741, 68 S.Ct. 1252, 1255, 92 L.Ed. 1690 (1948); *Satterfield*, 743 F.2d 840.

not rendered such assistance.[72] The defendant is also precluded from questioning the proceedings leading to the imposition of the sentence or the facts relied on by the prosecution. Indeed, under the construction of section 3553(e) of Title 18 and section 5K1.1 of the guidelines espoused by the government, the prosecution could arbitrarily or for an unconstitutional reason (*e.g.*, racial or sex discrimination) decide not to file the motion called for by these provisions, and the court could not intervene even if the defendant were able to demonstrate to it— should he be able to reach the ear of a court—that he had rendered massive assistance to law enforcement, to the point where his safety or even his life are in serious jeopardy.

It is the government's invariable position that, regardless of the circumstances, no one—neither the defendant nor a court— may challenge the prosecutorial decision not to initiate the process, or may even attempt to ascertain on what basis that decision was made, and that this is so although the decision will have enormous consequences for the defendant, running into many years of incarceration time. It is difficult to conceive of a parallel situation in the law where substantial liberty interests and consequences provided for by statute are beyond the power of inquiry by anyone.

### B. *Departure Committee*

█ None of this means that a court may or should substitute its judgment for that of the prosecution on the issue of defendant cooperation. Obviously the prosecutor has superior sources of knowledge on that score. But in the view of this Court, it has the authority to inquire so as to enable it to make a determination, based on facts adduced by both parties, whether the prosecution has made a decision that was not arbitrary, and that the procedures leading to that decision were not unfair.

█ It is with respect to the second part of this standard that the cases before the Court further fall short, for the decision-making apparatus adopted by the prosecutor's office in this District (and perhaps elsewhere) is inherently defective. In the one instance (that of Jane Doe), the Assistant U.S. Attorney assigned to the case did not know and was not able to advise the Court why the defendant's claim of substantial cooperation was deemed insufficient; in the other (Stephany Roberts), the prosecutor had actually concluded that the defendant's activities amounted to cooperation of a level sufficient to call for a sentence reduction.

In both instances, however, a so-called "Departure Committee," composed of individuals other than counsel prosecuting the case, operating under standards and procedures unknown to the Court and to the defendants, decided, for reasons not revealed to the Court or the defendants, after deliberation in secret, that the cooperation of these defendants was not of sufficient value to warrant the filing of a motion and hence the holding of a mitigation proceeding. Indeed, it appears that the defendant is not told in advance what the Departure Committee would regard as substantial assistance; that body makes its decision after the defendant has performed whatever acts the individual prosecutor, the FBI, or police officers have asked him to perform.[73] And performance of these acts does not guarantee a favorable result; the Departure Committee may still decline to authorize the filing of the requisite motion, and it may do so without giving any explanation.

This system lends itself to misunderstandings at best and entrapment of the defendant into taking action that could jeopardize his safety at worst. Since the

---

**72.** Guideline section 5K1.1(a) appears to assume that, once the prosecution has filed a motion, the court may weigh the various factors.

**73.** The committee appears even to have been in violation of the standard set by guidelines section 5K1.1. That section provided at the time the decisions herein were made that a departure motion is appropriate upon defendant's "good faith effort" to render substantial law enforce- ment assistance. The U.S. Attorney is taking the position that this language does not mean what it plainly appears to provide, but rather mandates an "objective" standard, that is one that, in the context of the Departure Committee procedure, can mean only such assistance as determined by the committee. As of November 1, 1989, the "good faith" language has been eliminated from the guidelines.

Assistant U.S. Attorney assigned to a particular case has no authority with respect to departure motions, he will presumably do no more than to inform the defendant and his counsel that he will make a positive recommendation to the Departure Committee should cooperation be forthcoming.[74] Thereafter, when the defendant has performed as best as he is able (*see* below), he may be informed by the Departure Committee that it did not consider his efforts to be sufficient, and his cooperation will not be rewarded with the sentence reduction the parties to the arrangement expected.

In part, this problem is created by the circumstance that the U.S. Attorney considers that a departure motion is not warranted even if the defendant informs the prosecution of all he knows about the criminal enterprise of which he is a part. Under the "benefit" theory adopted by the U.S. Attorney's Office, a defendant's complete cooperation with law enforcement is worth a departure motion only if that cooperation produces a major benefit to the government. What this means in practice is that relatively low level participants in crime (who do not know the heads of drug conspiracies or cartels) receive no departure credit for cooperation; only major figures who know other major figures benefit from section 3553(e) of Title 18 and section 5k1.1 of the guidelines under this policy.

Indeed, refusals to provide departure credit may hinge on even more capricious factors. In the *Stephaney Roberts* case, for example, the Departure Committee did not actually quarrel with the fact of defendant's cooperation. The reason for not giving her credit for that cooperation was not that she failed to do so; it was only that the enforcement agencies did not pursue her information because "something bigger, in their eyes more pressing, came up."[75]

More broadly, the procedure of deferring a decision on the filing of a departure motion until after the cooperation has been given, leaves it entirely to the discretion of the Departure Committee as to whether the defendant will receive any credit for his efforts (some of which may involve significant elements of personal danger).[76] These after-the-fact rulings add yet an additional element of unfairness to the process.

In the opinion of this Court, these standardless procedures administered by secret bodies, by which decisions of vast consequence to the defendants are arrived at, without the acknowledgement that these defendants have any rights in the mater, whatever their efforts, bear out the fears of arbitrary decision-making that some expressed when the historically judicial subject of sentencing was largely transferred to the prosecution. These extraordinary procedures do not comport with the kind of process that the Constitution requires as a prerequisite to the loss of liberty.[77]

## V

### Order

For the reasons stated, it is this 16th day of November, 1989

---

**74.** This message does not always come through clearly. In view of the unequal bargaining power between the parties, the defense side at times apparently assumes, without being explicitly disabused of the notion, that a recommendation is equivalent to a motion for a departure.

**75.** Tr. of September 7, 1989 hearing at 7.

**76.** Whenever a defendant cooperates with law enforcement by identifying confederates, his safety in the correctional system and elsewhere is in serious jeopardy. It should be noted, too, that the U.S. Attorney sometimes demands that defendants make "buys" of illegal drugs from members of drug syndicates to demonstrate cooperation, further significantly exacerbating the danger element, without any assurance to the defendant, as the system now works, that this will result in a departure motion.

**77.** In response to these conclusions, the government argues that since Congress has the power to circumscribe judicial discretion in sentencing, and that since it may prescribe mandatory sentences for certain offenses without infringing on the judicial authority or the rights of defendants, *a fortiori* the prosecution may constitutionally do what it has done and is doing here. The conclusion does not follow from the premise.

When Congress has seen fit to allow an exception from otherwise mandatory commands—as for example in the field of the exclusion of aliens—on account of the existence of certain conditions, the courts will not lightly hold that judicial scrutiny is unavailable with respect to a claim that discretion was arbitrarily exercised or withheld. *See, e.g., Jean v. Nelson*, 727 F.2d 957, 975 (8th Cir.1984); *aff'd on other grounds,*

ORDERED that hearings shall be held on November 28, 1989, on the requests of Stephaney Roberts and Jane Doe for a departure from the sentence fixed by the sentencing statute and the guidelines. At these hearings, the defendants shall have the burden of demonstrating the assistance they have rendered to law enforcement in accordance with requests by or understandings with the prosecution; the government may provide contrary information, either by way of direct evidence or through hearsay;[78] and if the Court determines that the prosecution's decision not to file a motion for a departure was arbitrary and capricious, it will order an appropriate departure from the otherwise applicable guideline sentence; and it is further

ORDERED that the charges against Albert Mills and Kenneth Wonson be and they are hereby dismissed for violation by the government of defendants' rights under the Due Process Clause of the Fifth Amendment and the Speedy Trial Act; and it is further

ORDERED that a hearing shall be held on November 28, 1989, on the circumstances of the dismissal in D.C. Superior Court of the charges against Vernon Holland and the bringing of similar charges in this Court, in light of the Due Process Clause and the Speedy Trial Act.[79]

---

472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985); *see also, Dunlop v. Bachowski,* 421 U.S. 560, 567–68, 95 S.Ct. 1851, 1857–58, 44 L.Ed.2d 377 (1975). This is particularly true where a liberty interest is involved and the claim is made that the agency violated the Constitution. *Wallace v. Christensen,* 802 F.2d 1539, 1552 (9th Cir.1986) (en banc); and *see Heckler v. Chaney,* 470 U.S. 821, 832, 105 S.Ct. 1649, 1656, 84 L.Ed.2d 714 (1985).

**78.** If the evidence concerns ongoing investigations with respect to which secrecy is required, the Court will order that such evidence be sealed.

**79.** It is unclear to what extent Holland associated himself with the motions filed by his co-defendant Mills. Since presumably for that reason the government has not filed any opposition with respect to Holland, it should in fairness be given the opportunity to contest the *Mills* issues in the Holland context. In addition to its participation at the November 28 hearing, the government may, of course, also file papers (on the assumption that the Mills motions include his co-defendant).