**UNITED STATES of America, Plaintiff,**

**v.**

**John BOSHELL, Defendant.**

**Nos. CR–88–361–S, CR–88–430–S.**

United States District Court,
E.D. Washington.

Jan. 11, 1990.

Earl Hicks, Asst. U.S. Atty., Spokane, Wash., for plaintiff.

Aaron L. Lowe, Spokane, Wash., for defendant.

## MEMORANDUM

ROBERT S. McNICHOLS, Chief Judge.

After a jury trial, Mr. Boshell was convicted of a single count of conspiracy to distribute cocaine. He was sentenced on January 4, 1990. At that time, the Court indicated that because the sentence imposed deviates substantially from that mandated under the Sentencing Guidelines, or at least the government's construction thereof, an explanatory memorandum would follow.

By all accounts, the venture which gave rise to the charge was impressive in scope, involved several dozen participants, as much as 90 kilograms of cocaine, and a nation-wide delivery scheme. While Mr. Boshell's role should not be minimized, he was a comparatively insignificant player. He also has some unique personal attributes.

Defendant had wanted to follow in the footsteps of his father and brother in law enforcement ever since he was a child. He did so by becoming a Los Angeles County Sheriff's Deputy for five years, and produced an unblemished record replete with citations for heroism and service beyond the call of duty. His involvement in the conspiracy commenced, not uncoincidentally, with the deterioration of his marriage. He apparently lost control of his life and served as a courier on at least five occasions. For that role, the Guidelines dictate a period of incarceration ranging from 151 to 188 months.

The government concedes that in the overall hierarchy, Mr. Boshell was an "average" player. The government further concedes that defendant built an enviable record during his years in law enforcement, but argues that having achieved a position

of trust and authority, and having breached that position, an appropriate sentence would be the top end of the Guidelines.

Mr. Boshell posits various arguments in mitigation, and asks the Court to find that: (1) his participation was minimal (United States Sentencing Commission, *Guidelines Manual*, § 3B1.2(a) (Nov.1989) [hereinafter "U.S.S.G."]; (2) he has accepted responsibility (*Id.* at § 3E1.1); (3) he should be held accountable only for a quantity of less than 500 grams (*Id.* at § 2D1.1(a)(3)); and (4) his individual life history should weigh heavily in favor of departing from the Guidelines. The first three are factual matters and need not be addressed in this memorandum. The last presents issues of statutory construction, and provides the grist for this mill.

### I. Statutory Conflict

■ To place the matter in perspective, the perceived conflicts are arrayed below.

No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.

18 U.S.C. § 3661.

In view of this limitation on limitations, it is surprising to see the Sentencing Guidelines purport to accomplish precisely what § 3661 says cannot be done. For example, the Guidelines limit the Court in a number of salient aspects in determining when departure is justified. Among those characteristics which cannot be considered, or given only limited consideration, are the following: (1) age (U.S.S.G. § 5H1.1, p.s.); (2) education (*Id.* at § 5H1.2, p.s.); (3) vocational skills (*Id.*); (4) mental condition (*Id.* at § 5H1.3, p.s.); (5) emotional instability (*Id.*); (6) physical condition (*Id.* at § 5H1.4, p.s.); (7) drug dependency (*Id.*); (8) successful recovery from drug dependency during the course of proceedings (*Id.*);[1] (9) employment history (*Id.* at § 5H1.5, p.s.); and (10) prior community service (*Id.* at § 5H1.6, p.s.).

1. *Contra, United States v. Rodriguez,* 724 F.Supp. 1118 (S.D.N.Y.1989) (relying on Ch. 1, Part A, Introduction 4(b)).

Historically, when rehabilitation still remained a goal of the criminal justice system, each of these factors might have been deemed highly relevant depending upon the circumstances of a given case, but their continuing validity as sentencing criteria has now been effectively wiped out by virtue of the sections cited.[2]

The Guidelines purport to reconcile this conflict by appending language to § 3661 not placed there by Congress.

> In determining the sentence to impose within the guidelines range, or whether a departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, *unless otherwise prohibited by law.* See 18 U.S.C. § 3661.

U.S.S.G., § 1B1.4 (emphasis added).

At first glance, this construction appears plausible since the focus is on information used for the "purpose of imposing an appropriate sentence," and, of course, what is an "appropriate sentence" is defined with reference to the Guidelines. The necessary assumption in order to validate this circular result, however, is that the Guidelines are on a par with congressional enactments. Therein lies the dilemma. If Congress said "Thou shalt," and in purportedly implementing legislative intent, the Secretary of an administrative agency said "Thou shalt not," then clearly the regulatory exercise would be ultra vires and thus void. *McNabb v. Bowen,* 829 F.2d 787, 789 (9th Cir.1987).

That the Guidelines do not per se offend the Separation of Powers Doctrine is set-

tled. *Mistretta v. United States,* —— U.S. ——, 109 S.Ct. 647, 658, 102 L.Ed.2d 714 *et seq.* (1989). The extent to which the Commission may displace existing legislation is not. Stated another way, it cannot be doubted that Congress has the authority to delegate supplemental rule-making powers. *Id.* What can be doubted is whether Congress may delegate the authority to strike down an express statute which both pre-existed the Guidelines, and which Congress recodified as part and parcel of the Sentencing Reform Act [SRA] which gave birth to the Guidelines.

If the inquiry could end here, so would this discussion with a ruling that to the extent the Guidelines purport to limit a court's discretion in making a departure decision, they are void for lack of a statutory predicate.

However, there is more, for not only is there a conflict between the cited Guideline policy statements and § 3661, but also a statutory conflict. The substantive provisions of the SRA are found, as might be expected, in Title 18, U.S.C. The procedural provisions are located in Title 28. The sometimes fine line between what is substantive and what is procedural has never been more obscure, for 28 U.S.C. § 994 contains provisions which suggest that § 3661, although re-enacted and recodified together with the SRA, may not mean what it says.

> The Commission in establishing categories of defendants for use in the guidelines and policy statements governing the imposition of sentences of probation, a fine, or imprisonment, governing the imposition of other authorized sanctions,

---

**2.** Concerned with the ever-increasing burdens visited upon a sprawling federal judiciary and the futility of "band aid" legislation, Congress authorized the commission of a select panel of congressmen, judges and others to frame the most critical issues facing the system and attempt to stimulate public debate. Title I of The Judicial Improvements and Access to Justice Act, P.L. 100–702, § 103(b). Just last month, that panel noted the absolute necessity of considering the personal characteristics of an accused:

> The Guidelines as implemented do not give the sentencing judge clear authority to adjust the sentence in the individual case in light of

all pertinent factors. For example, the Guidelines do not authorize the court to adjust the sentence in light of the defendant's personal history. Yet, it works an injustice to give the same sentence to two defendants, each of whom drives cocaine across the border, when one defendant is a 19 year-old gang member, and the other a 39 year-old father of three whose minimum wage job does not provide health insurance covering the expensive care required for his premature infant.

Federal Courts Study Committee, *Tentative Recommendations for Public Comment* at 62 (December 22, 1989).

governing the size of a fine or the length of a term of probation, imprisonment, or supervised release, and governing the conditions of probation, supervised release, or imprisonment, shall consider whether the following matters, among others, with respect to a defendant, have any relevance to the nature, extent, place of service, or other incidents of an appropriate sentence, and shall take them into account only to the extent that they do have relevance—

(1) age:

(2) education;

(3) vocational skills;

(4) mental and emotional condition to the extent that such condition mitigates the defendant's culpability or to the extent that such condition is otherwise plainly relevant;

(5) physical condition, including drug dependence;

(6) previous employment record;

(7) family ties and responsibilities;

(8) community ties;

(9) role in the offense;

(10) criminal history; and

(11) degree of dependence upon criminal activity for a livelihood.

28 U.S.C. § 994(d).

More explicit in terms of direction is § 994(e):

The Commission shall assure that the guidelines and policy statements, in recommending a term of imprisonment or length of a term of imprisonment, reflect the general inappropriateness of considering the education, vocational skills, employment record, family ties and responsibilities, and community ties of the defendant.

To say there is a conflict between 28 U.S.C. § 994(d) & (e) and 18 U.S.C. § 3661 would be to understate the proposition.[3] The plain and inescapable fact is that they cannot coexist.

Instructive in approaching this conflict is *United States v. Wills*, 881 F.2d 823 (9th Cir.1989). *Wills* addressed the question of whether a court has discretion to order a federal sentence to run concurrently with a state sentence. The import of the issue was that if such discretion does not exist, and if a federal sentence automatically runs consecutively, then the result would be a "direct consequence" of the plea and an accused would be entitled to be apprised of that consequence pursuant to FRCrP 11.

What troubled the *Wills* Court was the conflict between 18 U.S.C. § 3584(a) which clearly confers discretion on the trial court to determine whether a sentence should

---

**3.** Exactly what Congress had in mind in enacting §§ 994(d) & (e) is not as clear as might be desirable:

Subsection (e) specifically requires that the Sentencing Commission insure that the sentencing guidelines and policy statements reflect the "general inappropriateness" of considering education, vocational skills, employment record, family ties and responsibilities, and community ties of the defendant in recommending a term of imprisonment or the length of a term of imprisonment. As discussed in connection with subsection (d), each of these factors may play other roles in the sentencing decision; they may, in an appropriate case, call for the use of a term of probation instead of imprisonment, if conditions of probation can be fashioned that will provide a needed program to the defendant and assure the safety of the community.

The purpose of the subsection is, of course, to guard against the inappropriate use of incarceration for those defendants who lack education, employment, and stabilizing ties. It should be emphasized, however, that the Com-

mittee decided to describe these factors as "generally inappropriate," rather than always inappropriate, to the decision to impose a term of imprisonment or determine its length, in order to permit the Sentencing Commission to evaluate their relevance, and to give them application in particular situations found to warrant their consideration. The Committee believes that *it is important to encourage the Sentencing Commission to explore the relevancy to the purposes of sentencing of all kinds of factors, whether they are obviously pertinent or not; to subject those factors to intelligent and dispassionate professional analysis; and on this basis to recommend, with supporting reasons, the fairest and most effective guidelines it can devise. There are sufficient checks built into the system to avoid aberrations, and thus the guidance in this subsection is cautionary rather than proscriptive.*

*S.Rep. No. 98–225*, 98th Cong., 1st Sess. 174–75, *reprinted in* [1984] *U.S.Code Cong. & Admin. News* at 3357–58 (emphasis added).

run consecutively, and U.S.S.G. § 5G1.3 which holds that if a defendant is already serving an unexpired sentence, the new sentence "shall" run consecutively. As is the situation at bar, there was also the overlay of a conflict between Title 18 and Title 28.

28 U.S.C. § 994(a)(1)(D) confers upon the Sentencing Commission the authority to promulgate guidelines dictating "a determination whether multiple sentences to terms of imprisonment should be ordered to run concurrently or consecutively." The same section goes on to provide as follows:

> The Commission, in the guidelines promulgated pursuant to subsection (a)(1), shall for each category of offense involving each category of defendant, establish a sentencing range that is consistent with all pertinent provisions of title 18, United States Code.

28 U.S.C. § 994(b)(1).

Faced with the unresolvable, *Wills* opted to give credence to § 994(b)(1) at the expense of § 994(a)(1)(D), and thus credence to § 3584 at the expense of § 5G1.3. The decision would have been cleaner for present purposes had the Court drawn a bright line by holding that any time a conflict appears between substance and procedure, the former governs. As it was, *Wills* merely "harmonized" the SRA to the extent possible by minimizing the conflict. 881 F.2d at 826.

A'la *Wills*, the precise same problem appears here. Were there a conflict solely between § 3661 and U.S.S.G. § 5H1.1 et seq., there would be no contest. *McNabb, supra*, 829 F.2d at 789. Where the conflict is between 18 U.S.C. § 3661 and 28 U.S.C. § 994, the question is closer. This is not a situation where the newer statute controls over the older, as all were enacted at the same time. 881 F.2d at 826. Nor is it a case where the more specific controls over the more general, as § 3661 is very specific in providing that *"no* limitation shall be

placed on the information ... which a court ... may receive and consider...." The net result is that either 18 U.S.C. § 3661 does not mean what it says, or 28 U.S.C. § 994 does not. *Wills* had this to say when faced with such a conflict:

> We hold that a judge has discretion to impose a concurrent or consecutive sentence, as a matter of law, under section 3584(a). First, section 3584(a) unambiguously confers that discretion upon the trial judge. Although section 994(a)(1)(D) apparently would allow the Commission to eliminate the discretion, section 994(b)(1) requires that the Commission's guidelines be consistent with the provisions of Title 18, which include section 3584(a). *If the guidelines are to be consistent with Title 18, the discretion cannot be taken away.*

881 F.2d at 826 (emphasis added).

So it is here. If Congress should determine at some future juncture to delete § 3661, that may raise intriguing questions. So long as the statute exists, however, the Commission cannot take away the discretion conferred thereunder.

Accordingly, the Court holds that consistent with 18 U.S.C. § 3661, the relevance of the factors set forth at U.S.S.G. § 5H1.1 et seq. in rendering a departure determination is a matter of judicial discretion, and such discretion may not be proscribed, pre-empted or limited by the Sentencing Commission. That is not to say that the Guidelines are void en toto. If the subject factors have no relevance in a given case with respect to a given defendant, then obviously the range mandated under the Guidelines would provide the appropriate sentencing framework. It is to say that if Congress intends to turn the historical role of the courts in criminal proceedings on its ear, it should do so in a manner which is internally consistent and free of the ambiguity which presently plagues the SRA.[4]

---

4. There is light in the tunnel. It may signify the end of the tunnel, or perhaps an oncoming train. In any event, the Federal Courts Study Committee had this to say about the conflict created by the co-existence of 18 U.S.C. § 3661 and 28 U.S.C. § 994:

> Congress should amend the Sentencing Reform Act to state clearly that the Guidelines promulgated by the Sentencing Commission are general standards regarding the appropriate sentence in the typical case, not compulsory rules. Although the Guidelines should

## II. Penalty for Going to Trial

■] A conclusion that there is no bar to departure under the Guidelines does not end the inquiry, for the more elemental question is whether the Guidelines can be applied to this particular defendant in any event. It could hardly be argued that sentencing discretion has now shifted from the judiciary to the executive branch. *See generally, United States v. Roberts,* 726 F.Supp. 1359 (D.D.C.1989). There is no point in attempting to improve on Judge Greene's excellent commentary. Suffice it to say that by deciding what to charge, how to charge, and what aggravating factors to present or withhold, the United States Attorney knows from the day of drafting the indictment what sentence he wishes to impose and what sentence will in fact be imposed. That presents policy concerns.

Regardless of which political party holds sway, the process for selecting federal judges is much the same. Nominees are hung out like fresh meat to be poked, prodded and examined in minute detail as to every aspect of their personal and professional lives. The first step is to gain the confidence of a nominating senator who will conduct such investigation as he deems appropriate. Then the FBI, Department of Justice, the American Bar Association, and the Judiciary Committee get into the act. Only after surviving scrutiny that far will the Senate consider granting its stamp of approval. One need only harken back to President Nixon's well publicized failures to appreciate that the selection process is rigorous and demanding. Judges may (and we know from recent impeachment proceedings do) occasionally ascend the bench without the basic qualifications to serve, but when the system fails in that manner, it is aberrational in the extreme.

Compare that with the process whereby one becomes an Assistant United States Attorney:

> United States Attorney, Eastern District of Washington, is anticipating three-four openings for the position of Assistant United States Attorney in the Spokane and Yakima Offices. Applicants should have a minimum of two to five years' experience in criminal and/or civil litigation. Successful applicants will be required to undergo extensive FBI background check. Interested parties should send letter, law school transcript, resume and writing sample to: Screening Committee, Office of the United States Attorney, P.O. Box 1494, Spokane, WA 99210.

Spokane Bar Association, *Calendar Call,* December 11, 1989.

Congress has thus shifted discretion from persons who have demonstrated essential qualifications to the satisfaction of their peers, various investigatory agencies, and the United States Senate to persons who may be barely out of law school with scant life experience and whose common sense may be an unproven asset.[5]

One might say "Whoa there, your honor, a United States Attorney undergoes much the same stringent scrutiny as do judges. Can't we trust that he will delegate his authority only to responsible individuals?" The short answer is "no." Such delegation is no different in kind or effect than would be the case if judges delegated sentencing discretion to their law clerks.

There is one difference. In the judicial arena every decision is subject to review. Every decision rendered must be grounded on articulated facts and legal theories stated on the open record. An error in either regard is subject to appeal and reversal. When the decision is made by the prosecutor, there is no public proceeding, there are no enunciated facts, and legal theories be-

identify the presumptive sentence, the trial judge should have general authority to select a sentence outside the range prescribed by the Guidelines, subject to appellate review for abuse of discretion. The exercise of this discretion may be based upon factors such as an appropriate plea bargain or the defendant's personal characteristics and history.

*Tentative Recommendations for Public Comment, supra,* at 61.

**5.** So that no one misconstrues the point, this is an abstraction. The AUSA assigned to this matter has some years of experience under his belt, both in his current position, and previously as an assistant public defender.

come irrelevant. Whatever the decision, it is absolutely unreviewable. No matter how wrong, it cannot be corrected.

Moreover, if the goal of the SRA is to promote uniformity, it has already failed miserably, as it was destined to do from inception. It is no secret in this district that some AUSA's are more pliant than others, or that some defer more than others to their client agencies. The critical first inquiry for any defense lawyer in assessing the seriousness of the case against his or her client is not the offense charged, but which AUSA is handling the matter.

We do not face the gross abuse of prosecutorial discretion chronicled in *Roberts, supra.* The assistants in this district are honorable people of good will who take their responsibilities seriously and discharge their duty as they see it consistent with ethical and professional considerations. The point, rather, is that each does not see his or her duty in the same light; nor does each see a given offense as requiring the same sentence. In other words, Assistant United States Attorneys are no more fungible with respect to their values and perceptions than are judges or the man in the street.

The result is that pre–SRA, there were sentencing disparities. Some judges have a harsher view of life than do others. But the disparities were controllable and tolerable because decisions were public and reviewable. Post–SRA, there will still be sentencing disparities, but they will result from decisions made behind closed doors which are unreviewable either through any formal process or in the caldron of public scrutiny.

While the foregoing may sound like little more than rumblings from the trenches, it is a necessary prelude to considering whether application of the Guidelines to Mr. Boshell would penalize him for asserting his right to trial by jury. Because it is directly on point and mandatory precedent, a substantial passage from *United States v. Capriola,* 537 F.2d 319 (9th Cir.1976) is quoted below:

> Finally, appellants argue that more severe sentences were imposed upon them because they exercised their right to stand trial. If this is true, the constitutional rights of the appellants have been infringed. See *United States v. Stockwell,* 472 F.2d 1186 (9th Cir.), *cert. denied,* 411 U.S. 948, 93 S.Ct. 1924, 36 L.Ed.2d 409 (1973). In support of the contention, the appellants emphasize the disparity in the sentences imposed upon them, as compared to those received by their co-conspirators, who pleaded guilty. From the record before us, we cannot fairly evaluate the contention. The record does reveal that a number of individuals were originally supposed to have been involved in the criminal activity. The charges against two of them, Buegal and Wachter, were dismissed. Another, Bletcher, received a dismissal of one charge at the Government's request, and, upon a plea of nolo contendere to another charge, was sentenced to five months of suspended probation. A fourth, Kaplan, was permitted to plead guilty to the possession of marijuana and was awarded straight probation. He was a witness for the prosecution. A fifth, Caruso, pleaded guilty to one count and was ordered confined for a period of two years, the sentence to be served concurrently with a sentence of confinement which he was then serving. A sixth, Mazzie, pleaded guilty to one count, received a sentence of three years probation, with other counts dismissed. Mazzie was named in more counts than any other of the accused, and he, like Kaplan, testified for the prosecution. Finally, one Duley, who may have been the principal organizer of the whole illicit enterprise, pleaded guilty and was sentenced to a two-year period of confinement, this sentence, as in the case of Caruso, to be served concurrently with another sentence already being served by Duley.
>
> In contrast, the appellant Capriola, a lawyer, who pleaded not guilty, was sentenced after trial to a term of six years of imprisonment, to be followed by a three-year period of parole. And the appellant, Freeze, after trial and conviction, was sentenced to a three-year term of

confinement, with a mandatory three-year parole period.

There may be good and sufficient reasons for such substantial disparity in the treatment of those who did not stand trial and the appellants, who did. But, if there are such reasons, the record here is not adequately explicit to make those reasons readily discernible. See *United States v. Wiley*, 278 F.2d 500 (7th Cir. 1960).

When there is substantial disparity in sentences imposed upon different individuals for engaging in the same criminal activity, the preservation of the appearance of judicial integrity and impartiality requires that the sentencing judge record an explanation. A formal statement of reasons is not necessary. The courts may easily make their explanations orally during the sentencing procedures, and these will appear in the record.

*Id.* at 320–21 (footnote omitted); [6] *accord, United States v. Hutchings*, 757 F.2d 11, 14 (2nd Cir.), *cert. denied*, 472 U.S. 1031, 105 S.Ct. 3511, 87 L.Ed.2d 640 (1985).

In addition to Mr. Boshell, the following were players in the conspiracy charged:

| Name | File # | Sentence |
|---|---|---|
| Vaughn Jipner | 88–107 | Probation |
| Leonard T. Swirda | 88–164 | 11 years |
| Joseph D. Barbalinardo | 88–165 | Not yet sentenced |
| Joseph E. Mitchell | 88–166 | 11 years & 6 months |
| Leslie J. Anderson | 88–167 | Probation w/90 days confinement |
| Howard Hanaway | 88–168 | 5 years (mandatory minimum) |
| Paul Sweeney | 88–169 | 5 years (mandatory minimum) |
| Steven P. Marlton | 88–170 | Not yet sentenced |
| Renae Legard | 88–171 | Voluntary dismissal |
| Robert L. Knipple | 88–172 | Probation, $1,000 fine |
| William C. Balck | 88–173 | Not yet sentenced |
| Donald M. Foss | 88–174 | Acquitted at trial |
| Jeffrey J. Stack | 88–175 | Not yet sentenced |
| Wyatt Stanley | 88–176 | Probation |
| Michael S. Vandenberg | 88–177 | Probation, $500 fine |
| Derek Dean Bos | 88–178 | Probation |
| George W. Sharp | 88–179 | Probation, $1,000 fine |
| Clarence Watson | 88–265 | Pretrial diversion |
| Betty M. Watson | 88–306 | Pretrial diversion |
| Helaine Swirda | 88–358 | Probation |
| Frank Arnone | 88–359 | Not yet sentenced |
| Robert Fischer | 88–360 | 12 years & 11 months |
| Estanislao Kreutzer | 88–362 | 2 years |
| Harut Kirakossian | 88–363 | Not returned to this district |
| Laurie Innis | ——— | Granted pocket immunity |
| Michael Innis | ——— | Granted pocket immunity |

With the exception of Mr. Fischer and Mr. Arnone, who were both convicted at trial, and Mr. Foss, who was acquitted, each of the above pled to one or more charges or otherwise had their cases resolved short of trial.[7] As noted previously, the indicated Guideline range for Mr. Boshell is 151 to 188 months. It does not take a mental giant to appreciate that without exception, every defendant who pled re-

---

**6.** *Capriola* was limited to some extent by *United States v. Hall*, 778 F.2d 1427 (9th Cir.1985). The decision remains good law, however, for the proposition cited.

**7.** Mr. Fischer was sentenced on December 5, 1989 in accord with the Guidelines. While in a different posture than Mr. Boshell, both qualitatively and quantitatively, he is entitled to the benefit of this memorandum.

ceived more favorable treatment than is proposed for this gentleman.

True, some individuals, such as Jipner, Barbalinardo, and the Innises cooperated extensively with the government. Then too, in fairness to the government it should be mentioned that not everyone who received probation did so with the blessing of the prosecution. But it is also true that the kingpins of the organization, such as Swirda, Mitchell, Sweeney and Hanaway each received less time, without any cooperation, than is being urged for Boshell. It is also noteworthy that the time imposed on Swirda and Mitchell resulted not only from the offenses charged in this prosecution, but others as well.[8] Finally, the sentences arrayed *supra* are indeterminate in nature and subject to statutory "good time" reductions.[9] The plain fact is that were the government's recommendation accepted, Mr. Boshell—an "average" player—would actually serve between *double* and *triple* the time imposed on the non-cooperating kingpins.

This Court could not, consonant with *Capriola*, offer any principled reason justifying the disparity. It seems consistent, now that sentencing discretion is in the hands of the prosecution, to hold the government to the same standard.

Because the conspiracy spanned both pre-Guideline and post-Guideline time frames, the prosecution was able to offer bargains which contemplated pleading only to pre-Guideline activity. Every defendant who pled did so based on their pre-Guideline involvement.[10] Every defendant who insisted on going to trial, on the other

hand, did so with knowledge that he would face the Guidelines. There is nothing speculative about that observation. It was common knowledge throughout pretrial proceedings that those who wished to plea would obtain that break, and those who did not would be hammered under the Guidelines. That, *Capriola* tells us, is not the way the system works.

The gravity of the consequences to an accused under these circumstances cannot be overstated. Let us assume that we have a nation-wide conspiracy involving twenty-five participants. Some are heavy hitters in the cocaine industry with direct ties to sources outside of the country and who rely exclusively for their livelihood on drug proceeds. Some are more peripheral, serving only as messengers or couriers on a part-time basis. Some are more distanced yet and deal small quantities only to service their own drug habits.

One of the participants, whom we will call Mr. Jones, is not really a participant at all. He knows some of his associates deal in cocaine. He is physically present on several occasions when drug deals are transacted. He even takes a few phone calls and relays inconsequential messages; *e.g.*, "Tell Steve I'll be there at 8:00 p.m."; "Have Steve call me." But he personally does not deal, or handle drugs, or profit in any manner. At most, he is guilty of misprision of felony under 18 U.S.C. § 4, although even that is doubtful. *United States v. Warters*, 885 F.2d 1266, 1275–76 (5th Cir.1989) (misprision requires some affirmative act to conceal commission of felony).

---

8. In addition to entering a plea in 88–164, Swirda also resolved charges in 88–352, 88–364 and 89–157. Mitchell pled in both 88–166 and to subsequent charges in 88–266, 88–365 and 89–094.

9. The actual time to be served by those defendants who have pled and been sentenced is not presently known. What is known is that the sentences imposed will not be the sentences served.

Congress first sought honesty in sentencing. It sought to avoid the confusion and implicit deception that arises out of the present sentencing system which requires a judge to impose an indeterminate sentence that is automatically reduced in most cases by "good time" credits. In addition, the parole commission is permitted to determine how much

of the remainder of any prison sentence an offender will actually serve. This usually results in a substantial reduction in the effective length of the sentence imposed, with defendants often serving only about one-third of the sentence handed down by the court.
U.S.S.G. § Ch. 1, Part A, Introduction 3, p.s.

10. In addition to conspiracy, each defendant also faced substantive counts based on *Pinkerton* principles. See *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). Each defendant who pled did so to one or more pre-Guideline substantive counts. For reasons which are not relevant to this memorandum, the government elected to dismiss the substantive counts at the time of trial and proceed only on the conspiracy charge as against Mr. Boshell.

Sucked into the dragnet, however, Mr. Jones finds himself in the unenviable position of facing a conspiracy charge and the very real possibility that even on the slender reed of evidence available, he might be convicted in today's atmosphere. The prosecution offers him an equally unenviable choice. Plead to a pre-Guideline substantive count he did not commit and receive straight probation, or go to trial and if convicted face up to 188 months under the Guidelines which is in excess of the sentence received by the kingpins. What does a defendant do when faced with that choice? How does a lawyer counsel such a client?

Mr. Boshell said he was not guilty. He still so contends today. In this imperfect system, he may in fact not be, notwithstanding that a jury of his peers has held to the contrary and that such verdict is fairly supported by the evidence. The point, however, is not guilt or innocence, but an accused's right to look the government in the eye and say "prove it." The point also is that one who feels no guilt should not be forced to plead to a charge he *knows* he did not commit in order to avoid the risk of conviction for a charge he *might* have committed.[11] The net result is that Mr. Boshell, if sentenced under the Guidelines, would be penalized for going to trial. As applied to him, therefore, the Guidelines are unconstitutional.

### III. Departure

█ It is said on occasion that courts will not reach a constitutional question when a given issue can be decided on statutory grounds. That precept has been ignored in this instance because the perceived transgression has been so striking. A shorthand method of arriving at the

same conclusion, however, would be to note that among the fundamental objectives of the SRA was to achieve "*proportionality* in sentencing through a system that imposes appropriately different sentences for criminal conduct of different severity." U.S.S.G. Ch. 1, Part A, Introduction 3, p.s. (emphasis original).

The Court has looked, with the assistance of the Probation Department, for some indication in the *Guidelines Manual* that the Commission adequately considered a scenario such as extant here where the prosecution says "play ball and we'll pretend the Guidelines do not exist." That search has been in vain. Presumably, the Commission did not consider the matter because it never dawned on anyone that the government might consider the Guidelines a tool of convenience which it could embrace or reject as the vagaries of the moment might dictate.[12] The situation presented by the facts at bar not having been considered at all, let alone adequately, departure would seem warranted. U.S.S.G. § 5K2.0, p.s. Indeed, blindly applying the Guidelines to Mr. Boshell (but not to the several dozen other participants in the same conspiracy) would defeat every essential purpose underlying the entire scheme; *viz.*, honesty, uniformity and proportionality in sentencing decisions. U.S.S.G. Ch. 1, Part A, Introduction 3, p.s.

The prosecution urges that the conclusions reached will render future plea bargaining difficult, if not impossible. With respect to those defendants who are either unable or unwilling to make their act of contrition and provide the government with substantial cooperation, that is true.[13] Of interest in this regard are comments framed by the Federal Courts Study Committee:

11. In the abstract, there is nothing new about this scenario. What is new is the expanded level of the stakes.

12. The only mention even remotely on point is as follows:
Congress indicated that it expects judges "to examine plea agreements to make certain that prosecutors have not used plea bargaining to undermine the sentencing guidelines." S.Rep. No. 98-225, 98th Cong., 1st Sess. 63, 167 (1983). In pursuit of this goal, the Commission shall study plea agreement practice un-

der the guidelines and ultimately develop standards for judges to use in determining whether to accept plea agreements. Because of the difficulty in anticipating problems in this area, and because the sentencing guidelines are themselves to some degree experimental, substantive restrictions on judicial discretion would be premature at this stage of the Commission's work.
U.S.S.G. § 6B1.1 et seq., introductory commentary.

13. Which highlights yet another of the many perversities reflected in the Guidelines. As ini-

**642**

Instead of achieving the Congressional purpose of limiting and regulating sentencing discretion, the Guidelines have actually had the perverse effect of transferring discretion from the court to the prosecutor, who then exercises the discretion outside the system. The Guidelines have limited federal prosecutors' formal authority to offer concessions, but provided no additional resources to take more cases to trial. The rapid increase in the caseload compounds the problem. It appears that some prosecutors (and some defense counsel), in turn, have responded by evading and manipulating the Guidelines in order to induce pleas necessary to keep the system afloat. These practices occur regularly, despite the fact that many of them contravene the Attorney General's instructions to federal prosecutors, which state that departures from the Guidelines "should be openly identified rather than hidden between the lines of a plea agreement."

*Tentative Recommendations for Public Comment, supra,* at 62–63.

And therein lies the dilemma. With a caseload in excess of 165 felony prosecutions per judge in this district, bargaining is absolutely necessary as it would be logistically impossible to try more than a small percentage of the cases brought. On the other hand, closed door unreviewable decisions which result in extraordinary disparities between those who plead and those who do not are consonant neither with an accused's Sixth Amendment right to a public trial, nor with the express terms of the SRA.

In reaching this result, the Court appreciates that the circumstances which allowed for such an incredible range of sentences are fading. Sooner or later, the pipeline on Pre–Guideline activity will run out and the opportunity for such an inducement to plea may be reduced. However, because of the

vast range of charging options available to the prosecution, and the power to present or withhold aggravating or mitigating factors, the ultimate discretion will remain with the government, not with the Court.

Probably all the courts can do when they see a naked emperor is to say so. Perhaps if enough courts see enough imperial nudity and are sufficiently vocal about their perceptions, this grand experiment will eventually be relegated to the halls of academia whence it came. In the meantime, real people in the real world face the consequences of the "mathematization" of the criminal justice process wherein judges, lawyers, the accused and the system itself are reduced to integers in a pseudo-objective attempt to make sense out of human frailty which by definition makes none.

DONE BY THE COURT.

tially framed, an accused's "good faith" efforts in providing substantial assistance would earn him consideration. U.S.S.G. § 5K1.1 (Nov. 1987). Under the current version of that section, however, good faith is no longer relevant. Thus, a participant who knows where all the

skeletons are buried, such as Barbalinardo, Jipner or Kreutzer, can leverage his deep involvement into favorable treatment. A mule such as Mr. Boshell can only tell what he knows which, if not "substantial" within the meaning of U.S.S.G. § 5K1.1, will avail him little.