**UNITED STATES of America, Plaintiff,**

v.

**Gilberto REDONDO–LEMOS,
Defendant.**

**No. CR 89–208 TUC ACM.**

United States District Court,
D. Arizona,
Tucson Division.

Dec. 21, 1990.

Jan Kearney, Asst. U.S. Atty., Tucson, Ariz., for plaintiff.

Fernando Gaxiola, Tucson, Ariz., for defendant.

## MEMORANDUM OF DECISION

MARQUEZ, District Judge.

The following is an explanation of the Court's reasons for imposing a sentence below the minimum mandatory level although the defendant Gilberto Redondo–Lemos pled guilty to a charge which ordinarily would call for a five year minimum mandatory sentence.

### FACTS

Redondo–Lemos was charged in an indictment with knowingly and intentionally possessing with intent to distribute approximately 695 pounds of marijuana, a Schedule I controlled substance of 100 kilograms or more but less than 1,000 kilograms. The statutory penalty for this offense is five to forty years with a five year minimum mandatory, maximum $2,000,000 fine for an individual and at least a four year term of supervised release. 21 U.S.C. § 841(a)(1), 21 U.S.C. § 841(b)(1)(B)(vii). On September 14, 1989, Redondo–Lemos entered a plea of guilty to the indictment. On July 18, 1990, he was sentenced to a term of 18 months incarceration, with a 48 month term of supervised release.

On August 9, 1990, the government filed a Motion to Reconsider the Sentence. The basis for the motion was that the statute provides a mandatory minimum sentence of five years and Redondo–Lemos had provided no cooperation to the government. The Motion to Reconsider the Sentence was denied. The government has appealed the sentence imposed by the Court.

Redondo–Lemos was arrested on May 23, 1989, at approximately 8:00 a.m. A "concerned citizen" had notified the United States Border Patrol that he or she had seen a van enter the United States illegally from Mexico at the San Miguel gate on the Tohono O'odham Indian Reservation. Approximately one-half hour later, Customs Patrol Officers located an eastbound van which fit the description on State Route 86 near Robles Junction, Arizona. The officers activated the emergency red lights and siren and after a chase of approximately one-half mile, the van suddenly stopped and the driver ran from the vehicle. He was arrested and determined to be Redondo–Lemos. In the vehicle were found bundles containing 278 kilograms of marijuana.

Upon questioning, the Redondo–Lemos stated that he had been in Sasabe, Sonora, Mexico, the previous weekend (May 20 and 21, 1989), at which time a person named Juan (last name unknown) asked him if he wanted to work. The rest of the scenario is all too familiar. As occurred in this case, defendants are offered a sum of money to drive a vehicle across the border and leave it at some shopping center. In most cases they have no idea of the amount of drugs in the vehicle.

Such defendants, commonly referred to as "mules", are in no position to cooperate with the government in a more extensive investigation, because they know nothing. The extent of their involvement is one or two meetings with a previously unknown person. Only first names are used, which are probably false names. The defendants have no idea who is involved on the American side. Their instructions are to leave the vehicle at some shopping center. There is a K–Mart in the South Side of Tucson which is constantly referred to as a

drop-off place. The Court suspects that if the DEA had trained dogs at this lot on a twenty-four hour basis, seizures of drug loads would increase substantially. Sometimes the agents try to make a controlled delivery with the defendant's cooperation. In this case the agents did not attempt a controlled delivery.

The presentence report shows that Redondo–Lemos has no prior convictions.

Redondo–Lemos was twenty-five years of age at the time of his arrest. He was born in Mexico, the fifth of eight children. At the age of twelve his parents separated and his mother brought the family to the United States, settling in Tucson, Arizona. He is a resident alien in the United States.

Redondo–Lemos married on September 29, 1984, and has a four year old child. His wife was pregnant at the time of the arrest. He is described as a good father and husband who tries very hard to do what is right and to support his family. His wife feels that he became involved in this offense because he was desperate for money as bill collectors were calling them because he was between jobs at the time.

Redondo–Lemos has worked at various jobs including construction worker, truck driver, janitor, and field laborer. At the time of the presentence report preparation he was employed earning $300.00 a week as a truck driver. His wife was not employed. His liabilities exceed his net worth by $10,000. His expenses exceed his income by $400 a month.

## DISCUSSION

Mandatory sentences have been upheld and there is no doubt that the length of sentence can be determined by the legislature. *United States v. Valenzuela,* 646 F.2d 352, 354 (9th Cir.1980). Congress can give prosecutors the choice between statutes with and without minimum mandatory sentences and this does not violate separation of powers. *United States v. Holmes,* 838 F.2d 1175 (11th Cir.1988).

The federal sentencing guidelines have also been held constitutional; however, it is open to the lower courts to consider due process issues arising in the context of the sentencing law and the sentencing guidelines. *See United States v. Baskin,* 886 F.2d 383 (D.C.Cir.1989) (remanding the defendant's case for reconsideration of his sentence and resolution of his due process and eighth amendment challenges to the sentencing guidelines).

*Charging and Sentencing Disparities*

With a caseload approaching 200 felony prosecutions per judge in the Tucson division, approximately thirty-six to forty cases and thirty to forty sentencings pending at all times before each judge, it does not take long for a district judge to notice that there is great disparity in the charges to which defendants are pleading and their plea agreements even though the relevant conduct in most cases is very similar.

As pointed out by Honorable Harold H. Greene in *United States v. Roberts,* 726 F.Supp. 1359, 1360 (D.D.C.1989):

> More recently, fact patterns indicating due process problems in sentencing have continued to emerge in criminal cases before this Court and elsewhere. The Court of Appeals for this circuit, in a remand 'direct[ed] the district court to address' the due process challenge that had been asserted there. It thus appears that, notwithstanding *Mistretta [v. United States,* 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) ], it is open to the lower courts to consider due process issues arising in the context of the sentencing law and the sentencing guidelines.

(citation omitted). *Roberts, supra* and *United States v. Boshell,* 728 F.Supp. 632 (E.D.Wash.1990), are two cases illustrating the abuses that have arisen due to the shift of sentencing discretion from the judiciary to the executive branch. This Court is convinced that there are many more. As pointed out by Honorable Robert J. McNichols in *Boshell,*

> ... by deciding what charge, how to charge, and what aggravating factors to present or withhold, the United States Attorney knows from the day of drafting the indictment what sentence he wishes

to impose and what sentence will in fact be imposed.

728 F.Supp. at 637.

In *Roberts, supra,* the United States Attorney's Office had a Departure Committee which decided whether or not a Motion to Reduce Sentence for the defendant's cooperation was to be filed. There were no standards by which this decision was made. The *Roberts* court observed that

[i]n the opinion of this Court, these standardless procedures administered by secret bodies, by which decisions of vast consequence to the defendants are arrived at, without acknowledgement that these defendants have any rights in the mater (sic), whatever their efforts, bear out the fears of arbitrary decision-making that some expressed when the historically judicial subject of sentencing was largely transferred to the prosecution. These extraordinary procedures do not comport with the kind of process that the Constitution requires as a prerequisite to the loss of liberty.

726 F.Supp. at 1376.

In Tucson, as far as this Court is aware, there is no committee to decide whether or not a Motion to Reduce Sentence (Mandatory Sentence) for the defendant's cooperation is to be filed, nor are there any guidelines to determine when a defendant will be permitted to plead to a lesser included charge which would bring the penalty below the mandatory minimum. The following representative cases which have come before the Tucson judges during the past approximate eighteen months illustrate the unfairness of the current system.

*Name* CR 89–208 Gilberto Redondo–Lemos

*Charge* Possession with Intent to Distribute 100 to 1,000 Kilograms of Marijuana

*Facts* Set out above.

*Possible Penalty* 5 to 40 years, 5 years minimum mandatory

*Charge Pled To* Redondo–Lemos pled to the indictment.

*Sentence Imposed* 18 months

As pointed out above, the government is appealing the sentence.

*Name* CR 89–336 Eufemia Molina (female)

*Facts* On October 10, 1989, at approximately 9:20 a.m., the defendant was observed traveling north on Interstate 19, driving a 1984 Mercury Topaz. Border Patrol Agents followed the vehicle and eventually stopped it. Found in the trunk were 307 pounds (139 kilograms) of marijuana.

The defendant stated that she was motivated to commit the crime for economic reasons. She receives only $389.00 a month from Social Security Disability Benefits. She stated that the day prior to her arrest, she had gone to Nogales, Sonora, Mexico. She had previously worked as a waitress in the area, and was approached by a person she knew who asked if she would like to earn some money. As usual in these cases, she ended up driving a car and being arrested.

*Charge* Molina was not indicted. A complaint was filed charging her with possession with intent to distribute 100 to 1,000 kilograms of marijuana.

*Possible Penalty* 5 to 40 years, 5 years minimum mandatory.

*Charge Pled To* Molina pled guilty to the lesser included offense of possession with intent to distribute less than 50 kilograms of marijuana. This calls for a maximum sentence of five years, and probation is available.

*Plea Agreement* The United States Attorney entered into a plea agreement that the maximum sentence imposed would be one year.

*Sentence* Molina received three years probation.

*Names* CR 89–302 Jose Becerra–Rodriguez and Jose Ramon Parra–Macias

*Facts* On September 4, 1989, at approximately 2:15 a.m., United States Customs agents were notified that a vehicle had made an illegal entry into the United States at the Christmas Gate located on the Tohono O'odham Indian Reservation. Surveillance observed the vehicle traveling on Route 12 Eastbound from the Christmas

Gate. The vehicle was temporarily lost from observation by the agents. At approximately 6:45 a.m. the vehicle was located. The driver attempted to escape at a high rate of speed but was eventually stopped. It was determined that there were 1,149 pounds (522 kilograms) of marijuana in the car.

*Charges* Both defendants were named in a two count indictment charging them with possession with intent to distribute 100 to 1,000 kilograms of marijuana and importation of the same marijuana.

*Possible Penalty* [1] 5 to 40 years, 5 years minimum mandatory

*Charges Pled To and Sentences* Both defendants pled guilty to possession with intent to distribute 50 kilograms or more, but less than 100 kilograms. These charges are below the mandatory five year minimum. Both defendants received sentences of 18 months.

---

*Name* CR 89–367 Russell Francisco Conde

*Facts* On October 31, 1989, the defendant was stopped by Border Patrol Agents on the Tohono O'odham Indian Reservation. 502 pounds (228 kilograms) were found in the car. Scenario is the same as in all of these cases. The defendant said he was offered $5,000 to drive a truck from the other side of the Mexican border.

*Charge* Possession with Intent to Distribute 100 to 1,000 Kilograms of Marijuana

*Possible Penalty* 5 to 40 years, 5 year minimum mandatory

*Charge Pled To* Conde pled to the lesser included offense of possession with intent to distribute 50 to 100 kilograms. This reduced the possible penalty to below the mandatory minimum of five years.

*Sentence* Conde was sentenced to 27 months.

---

*Name* CR 90–230 Arnoldo Beltran–Cazarez

*Facts* On May 20, 1990, the defendant was arrested after crossing the border at other than a port of entry in a 1972 pickup truck. A total of 1,592 pounds (723 kilograms) of marijuana was seized from the truck. The facts are the same. He was approached by someone to drive a car across the border.

*Charge* Possession with Intent to Distribute 100 to 1,000 Kilograms of Marijuana

*Possible Penalty* 5 to 40 years, 5 years minimum mandatory

*Charge Pled To* Beltran–Cazarez pled to the lesser included offense of possession with intent to distribute less than 50 kilograms. This reduced the penalty to below the mandatory five year minimum.

*Sentence* Beltran–Cazarez was sentenced to 12 months.

---

*Names* CR 89–431 Hector Figueroa and Cristobal Berrellez

*Facts* A confidential informant provided information to DEA regarding the marijuana trafficking activities of the two defendants. As a result, Berrellez entered into negotiations with an undercover DEA agent for the purchase of between 250 and 500 pounds (113–227 kilograms) of marijuana. The negotiations led to the arrest of the two defendants. Both defendants were involved in the negotiations. Berrellez had $50,000 in his possession when he was arrested. $104,000 was seized at Figueroa's residence.

*Charge* Conspiracy to Possess with Intent to Distribute 100 to 1,000 Kilograms of Marijuana

*Possible Penalty* 5 to 40 years, 5 years minimum mandatory

*Charges Pled to* Figueroa pled to the indictment. Berrellez pled to a lesser included offense which did not provide for a mandatory minimum sentence.

*Sentences* Figueroa was sentenced to five years and Berrellez was sentenced to 3 years.

---

**1.** Where multiple offenses are charged, possible penalty is for most serious offense of which defendants could have been convicted.

In *none of* the above cases did the government file a Rule 35 motion. Rule 35(b), Federal Rules of Criminal Procedure, provides that

> [t]he court, on motion of the Government, may within one year after the imposition of a sentence, lower a sentence to reflect a defendant's subsequent, substantial assistance in the investigation or prosecution of another person who has committed an offense.... The court's authority to lower a sentence under this subdivision includes the authority to lower such sentence to a level below that established by statute as a minimum sentence.

Except for the sentence imposed on Eufemia Molina, the above dispositions do not appear to have been made on the basis of race, religion, gender, or other arbitrary classification. This Court recognizes that the Ninth Circuit has held that

> 'the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation' so long as 'the selection was [not] deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification'.

*U.S. v. Kidder,* 869 F.2d 1328, 1335 (9th Cir.1989) (quoting *Bordenkircher v. Hayes,* 434 U.S. 357, 364–65, 98 S.Ct. 663, 668–69, 54 L.Ed.2d 604 (1978) (quoting *Oyler v. Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 505, 7 L.Ed.2d 446 (1962))).

Although the Ninth Circuit correctly cited *Bordenkircher* as it applied to *Kidder,* the Supreme Court in *Bordenkircher* also said:

> There is no doubt that the breadth of discretion that our country's legal system vests in prosecuting attorneys carries with it the potential for both individual and institutional abuse. *And broad though that discretion may be, there are undoubtedly constitutional limits upon its exercise.*

434 U.S. at 365, 98 S.Ct. at 669 (emphasis supplied). The Court further observed that [t]his potential has led to many recommendations that the prosecutor's discretion should be controlled by means of either internal or external guidelines. *See,* ALI Model Code of Pre–Arraignment Procedure for Criminal Justice, Section 4350.3(2–3) (1975); ABA Project on Standards for Criminal Justice, The Prosecution Functions, Sections 2.5, 3.9 (APP. draft 1971); Abrahams Internal Policy: Guiding the Exercise of Prosecutorial Discretion, 19 UCLA L.Rev. 1 (1971).

*Id.,* n. 9.

Without a showing by the government that there are some guidelines being followed in deciding which defendants are going to be permitted to plead to lesser included offenses, this Court is of the opinion that we have reached the constitutional limits on exercise of prosecutorial discretion the Supreme Court had in mind in *Bordenkircher.* After all, the Sentencing Reform Act has guidelines that the sentencing judge must follow and if he departs above or below the guidelines, he must explain the departure. Are prosecutors, some just out of law school, to be given totally unfettered discretion?

### Due Process and Equal Protection Violations Based on Defendants' Gender

It is the further opinion of this Court that the manner in which the mandatory statutes are being applied by the government violates males' due process and equal protection rights, because similarly situated female defendants are consistently permitted to plead to lesser included offenses which do not expose them to minimum mandatory sentences. Following are some examples of cases that have been processed in the Tucson District in the last approximate twelve months.

---

*Names* CR 90–081 Humberto Rios, Jose Rosario Avechuco–Fuentes, Victor Manuel Lopez and Imelda Ruth Lopez

*Facts* On July 27, 1989, at approximately 9:47 a.m., a Border Patrol Agent observed large black bundles being unloaded from two different pick-up trucks on the east side of a residence located in Sierra Vista. Based on the agent's experience he decided

that they were bundles of marijuana. The female, Imelda Lopez, was observed supervising the unloading. A search warrant was obtained and 276 pounds (125 kilograms) of marijuana was found in a shed on the premises.

*Charges* The indictment contained two counts. Count One charged conspiracy to possess with intent to distribute 100 to 1000 kilograms of marijuana. Count Two charged possession with intent to distribute the same marijuana.

*Possible Penalty* 5 to 40 years, 5 years minimum mandatory

*Charges Pled to and Sentences*

Victor Lopez—pled to lesser included offense, sentenced to 36 months.

Avechuco–Fuentes—pled to lesser included offense, sentenced to 24 months.

Rios—fugitive, warrant for arrest issued

Imelda Lopez—indictment dismissed

This case supports both propositions, i.e.:

1. Females are treated more favorably; and,

2. There is no rational, objective basis on which charges against defendants are reduced below the minimum mandatory level.

---

*Names* CR 89–326 Jose Saul Vargas–Felix, Aida Lopez–Verdugo, Encarnacion Cardenas–Lopez, Alberto Herran–Saucedo

*Facts* On September 5, 1989, undercover agents entered into negotiations with Vargas–Felix concerning the purchase of heroin. Present was a woman representing herself as his wife, Aida Felix, later identified as the defendant Aida Lopez–Verdugo. The undercover agents agreed to buy three ounces of heroin for $10,500. Later negotiations involved the other male defendants. Cardenas–Lopez' wife, Maria Carmen Franco, was present during some of the negotiations. She was not charged with any offense. In total, 528.5 grams of heroin were confiscated after defendants' arrests.

*Charges* The indictment contains three counts charging the defendants with conspiracy to possess with intent to distribute 100 grams to 1 kilogram of heroin; posses-

sion with intent to distribute the same; and aiding and abetting.

*Possible Penalty* 5 to 40 years, 5 year minimum mandatory

*Charges Pled To and Sentences*

Vargas–Felix and Cardenas–Lopez both pled guilty to possession with intent to distribute 100 grams to 1 kilogram of heroin, with a five year cap on the possible sentence. Both were sentenced to five years. Herran–Saucedo also pled guilty to this charge, with a six year cap. He received a sentence of six years.

Aida Lopez–Verdugo, the only female defendant, entered an *Alford* plea to misprision of a felony. The government recommended three years probation, which was the eventual sentence. The implications in these dispositions are obvious.

---

*Names* CR 90–055 Patricia Cruz–Bernal
CR 90–073 Reynaldo Dominguez

*Facts* On February 6, 1990, Border Patrol Agents observed the two defendants at the border fence. Bundles were thrown over the fence and loaded into the trunk and backseat of an automobile. Reynaldo Dominguez was the passenger and Patricia Cruz–Bernal was the driver. When they were stopped, both defendants stated they had made plans the night before to pick up the load, and would be paid $2,500.

*Charges and Sentences*

Dominguez was indicted for importing and possession with intent to distribute marijuana. He was eventually sentenced to 96 months. Cruz–Bernal was charged in an information with simple possession of marijuana. She was sentenced by a Magistrate to time served, which consisted of two days.

---

*Names* CR 89–241 Laura Lorena Ortiz–Villareal, Nereida Garcia–Leyva, Sarelia Gomez–Rubio, Jorge Luis Gomez, Enrique Romo–Lopez and Sara de Jesus Rubio de Gomez

*Facts* Undercover agents negotiated with Laura Lorena Ortiz–Villareal for the pur-

chase of several kilograms of cocaine. By prearrangement, Ortiz–Villareal, accompanied by two other female defendants Garcia–Leyva and Gomez–Rubio, delivered one kilo of cocaine to the agents at a Circle K store. They were then arrested. The male defendants Gomez and Romo–Lopez were also arrested at the Circle K when they arrived to meet the women.

After the arrests, agents searched an apartment that had been identified as the source of the cocaine. The residents of the apartment included Gomez, his wife Sara de Jesus Rubio de Gomez, their daughter Sarelia Gomez–Rubio and Ortiz–Villareal. Found in the apartment were approximately 80 kilograms of cocaine. Rubio de Gomez was arrested in the apartment.

*Charges* A superseding indictment charged all of the defendants with (Count One) conspiracy to possess and (Count Two) possession with intent to distribute approximately 80 kilograms of cocaine within 1,000 feet of a public school.

*Possible Penalty* 5 to 80 years, 5 years minimum mandatory

*Dispositions*

Jorge Luis Gomez was convicted of Count Two by jury verdict, and sentenced to 240 months. Laura Ortiz–Villareal pled guilty to Count One, a lesser included conspiracy charge, and was sentenced to 63 months. Sarelia Gomez–Rubio pled to misprision of a felony and was sentenced to 18 months. Nereida Garcia–Leyva also pled to misprision of a felony and was sentenced to 181 days. The charges against Sara de Jesus Rubio de Gomez and Enrique Romo–Lopez were dismissed.

---

*Name* CR 89–336 Eufemia Molina

*Facts* Set out at page 7.

*Charge and Disposition* This case involved an amount of marijuana which would require a mandatory minimum sentence of five years. Molina was allowed to plead to a lesser included offense, and eventually received probation.

---

*Names* CR 89–395 Paul Lascurain, Roberto Rangel–Martinez, Humberto Enriquez, Rigoberto Gastelum–Arvizu, Luis Flores–Yslas and Jenny Chico

*Facts* On November 16, 1989, DEA agents followed a Dodge pickup truck believed to be loaded with marijuana from the San Miguel gate on the Tohono O'odham Indian Reservation to a residence near Sells, Arizona. It was met by defendants Lascurain and Rangel–Martinez, who placed blankets over exposed plastic bales in the back of the truck. It was then driven to Tucson, preceded by a 1981 Cutlass driven by Lascurain and followed by a Ford mini-truck driven by Rangel–Martinez.

The vehicles were followed to Tucson, where agents observed the marijuana being unloaded from the Dodge pick-up into one of two adjacent trailer homes. Lascurain then left the scene in the Ford mini-truck, and was arrested a short distance away. Agents found 28 bales of marijuana in the first trailer home. Defendants Gastelum–Arvizu and Enriquez were arrested in the second. Enriquez admitted that he was renting the first trailer home, and was being paid by Gastelum–Arvizu to store marijuana there. Defendant Flores–Yslas was arrested when he arrived at the trailer homes to pick up some of the marijuana.

The Cutlass was later observed at a nearby convenience store, occupied by the defendants Rangel–Martinez and Jenny Chico. Behind Jenny Chico's seat was a bale of marijuana which appeared identical to the bales of marijuana found in the trailer home. The total amount of marijuana seized was approximately 400 pounds (181 kilograms).

*Charges* The indictment charges conspiracy to possess with intent to distribute; and possession with intent to distribute 100 to 1,000 kilograms of marijuana.

*Possible Penalty* 5 to 40 years, 5 years minimum mandatory

*Dispositions*

Humberto Enriquez pled guilty to a lesser included offense of possession with intent to distribute 50 to 100 kilograms of

marijuana. The plea agreement provided for 41 to 63 months binding. The government was to make a Rule 35 Motion if Enriquez cooperated. He eventually received 5 years probation. Paul Lascurain pled guilty to a lesser included offense of possession with intent to distribute 50 to 100 kilograms of marijuana. His plea agreement provided for 30 to 63 months. He received 48 months. Rangel–Martinez, Gastelum–Arvizu and Flores–Yslas all pled guilty to the same lesser included offense as Lascurain. Their plea agreements all provided for 41 to 63 months, and they all received 41 months. The indictment was dismissed as to Jenny Chico.

All of the male defendants with the exception of Enriquez went to prison. The charges against the female defendant were dismissed. In addition, all of the men pled to a charge below the mandatory level, although the amount of marijuana was well above the mandatory weights. This case illustrates both problems inherent in the present system. Females are consistently treated more favorably than males, and among males there is no explanation as to why some are permitted to escape a mandatory five year minimum sentence. Yet, also without any explanation, the government would have Redondo–Lemos serve at least five years.

As can be seen from the foregoing, there is no consistency as to how "mules" are treated. Females are consistently treated more favorably than are males. Some male mules are treated more favorably than are others. Finally, some defendants who engage in much more serious conduct than mules, such as negotiating with undercover agents for large amounts of drugs (which obviously shows they are "dealers"), are treated more favorably than some mules. The question of "proportionality" becomes obvious.

Unfortunately, due to this Court's caseload, the Court was unable to prepare this memorandum before appeals were filed by both sides. Ideally, the Court would have conducted a hearing and given the government an opportunity to explain what appear to be constitutional violations. Maybe there is some explanation other than the attitude that prosecutors have unfettered and total discretion to do anything they want.